In re **AMERICAN POUCH FOODS, INC.,** Debtor.

**UNITED STATES of America,** Plaintiff,

v.

**AMERICAN POUCH FOODS, INC.,** Defendant.

**Nos. 81 C 1616, 80 B 14821 and 80 A 2375.**

United States District Court, N.D. Illinois, E.D.

June 20, 1983.

Dan K. Webb, U.S. Atty. by Mary Anne Mason, Asst. U.S. Atty., Chicago, Ill., J. Christopher Kohn, Tracy Whitaker, David Nerkle, Dept. of Justice, Civ. Div., Washington, D.C., for plaintiff.

**1016**

Sharon Riley, Louis W. Levit, Levit & Miller, Ltd., Chicago, Ill., for defendant.

## MEMORANDUM OPINION

BUA, District Judge.

On January 29, 1979, American Pouch Foods Company, Inc. ("APF") and the Defense Logistics Agency ("Government") entered into a contract to produce combat rations known as "Meals, Ready to Eat." This product is a replacement for the C–Ration, intended for use principally by the United States Army and, to a lesser extent, by other branches of the armed services.

Under the terms and conditions of the contract, APF could receive up to 90% of the amount of its total costs incurred under the contract in the form of "progress payments." As one of the terms or conditions for making these progress payments, subsection (d) of the contract provided:

> (d) Title. Immediately, upon the date of this contract, title to all parts; materials, inventories; work in process; ... theretofore acquired or produced by the Contractor and allocable or properly chargeable to this contract under sound and generally accepted accounting principles ... shall forthwith vest in the Government; and title to all like property thereafter acquired or produced by the Contractor and allocable or properly chargeable to this contract as aforesaid shall forthwith

vest in the Government upon said acquisition, production or allocation.[1]

APF has received approximately $13 million in "progress payments."

On November 7, 1980, the Defense Personnel Support Center terminated the Government's contract with APF for default. On November 10, 1980, APF filed a petition under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101, *et seq.* At that time APF had in its possession raw materials, work in process, and finished products held at various facilities. The Government claimed all of this property by virtue of the "title vesting" clause of the contract. However, as a result of APF's petition for reorganization, an automatic stay was imposed pursuant to 11 U.S.C. § 362 (1976), preventing the Government from obtaining possession of the property.

On December 5, 1980, the Government filed an adversary complaint for relief from the automatic stay. On January 16, 1981, APF filed an answer and counterclaim. In its counterclaim, APF alleged that the contract termination was unlawful and improper and that as a result of it, APF sustained damages in the aggregate sum of approximately $13 million. Hearings were held, and, on February 9, 1981, the Bankruptcy Court granted the Government relief from the automatic stay and permission to take immediate possession of the property. In

---

1. In addition to that already quoted in the text of the opinion, the clause provides:

   Notwithstanding that title to property is in the Government through the operation of this clause, the handling and disposition of such property shall be determined by applicable provisions of this contract such as: the Default clause and paragraph (h) of this clause; Termination for Convenience of the Government clause; and the Special Tooling clause. Current production scrap may be sold by the Contractor without approval of the Contracting officer and the proceeds shall be credited against the costs of contract performance. With the consent of the Contracting Officer and on terms approved by him, the Contractor may acquire or dispose of property to which title is vested in the Government pursuant to this clause, and in that event, the costs allocable to the property so transferred from this contract shall be eliminated from the costs of contract performance and the

   Contractor shall repay to the Government (by cash or credit memorandum) an amount equal to the unliquidated progress payments allocable to the property so transferred. Upon completion of performance of all the obligations of the Contractor under this contract, including liquidation of all progress payments hereunder, title to all property (or the proceeds thereof) which had not been delivered to, and accepted by the Government under this contract or which had not been incorporated in supplies delivered to and accepted by the Government under this contract and to which title has vested in the Government under this clause shall vest in the Contractor. The provisions of this contract referring to or defining liability for Government-furnished property shall not apply to property to which the Government shall have acquired title solely by virtue of the provisions of this clause.

its decision, the Court found that as a matter of law, the Government held absolute title to the property by operation of the "title vesting" clause of the contract. The bankruptcy judge did not rule on APF's counterclaim. APF appealed.

On February 1, 1982, this Court concluded that the bankruptcy judge erred in granting relief to the Government because of the existence of two factual questions regarding: (1) the termination of the contract between the Government and APF, and (2) the characterization of the interest held by the Government in the property to which it claimed title. Accordingly, the cause was remanded to the bankruptcy judge for a full evidentiary hearing on both issues.

The case is now before this Court on the Government's motion for reconsideration. The Government argues that the bankruptcy court properly treated the title issue as a question of law, and that the case law squarely holds that "title-vesting" clauses, using language substantially identical to that in the contract between the Government and APF, are sufficient to vest absolute title in the Government and allow it to reclaim materials allocable to the contract upon termination for default. The Government also contends that the circumstances concerning the termination of the contract are irrelevant to the title issue. APF, on the other hand, argues 1) that the title asserted by the Government is a security interest only, 2) that this interest was not perfected in the manner prescribed by applicable state law, and 3) that such title to the extent otherwise valid at all, is subordinate and inferior to the rights of the debtor as debtor-in-possession in this proceeding and to the rights of creditors and other parties in bankruptcy. APF also contends that the Government may not assert title under a contract which it has wrongfully terminated.

For reasons that will be made clear, this Court holds that, as a matter of law, the Government holds absolute title to the property. Additionally, the Court rejects APF's assertion that the Government's title is in any way affected by the allegedly wrongful termination of the contract between APF and the Government. Finally, the Court declines to address the question, presented in APF's counterclaim, of whether the contract was in fact wrongfully terminated, thus entitling APF to damages. That issue is properly brought before the administrative agency empowered to address such claims.

## I. *"Title Vesting" Clauses in Progress Payment Provisions*

### A. *The Marine Midland Case*

There is a substantial body of case law supporting the Government's position as to title. That fact should make this case one of easy disposition. A recent opinion which seemingly supports APF's argument has complicated the picture, however. That decision is *Marine Midland Bank v. United States,* 687 F.2d 395 (Ct.Cl.1982). Because that case calls into question some fundamental assumptions implicit in earlier opinions, this Court believes the title issue demands re-examination. Although ultimately this Court's conclusion is in accord with most of the precedent on this question, it is hoped that the following discussion offers an analytical framework that will eliminate any unnecessary confusion.

Before proceeding to an analysis of prior precedent, some discussion of *Marine Midland* is in order. In that case, the plaintiff bank brought suit against a government contractor which had agreed to guarantee the indebtedness of a third party. Pursuant to this agreement, the bank secured a floating lien on the contractor's property, including its inventory. Upon the third party's default, the bank sought to obtain possession of the contractor's property. At this point, the Government intervened, claiming that the bank could not take possession of the property because it belonged to the Government in accordance with the "title vesting" clause contained in its written agreement with the contractor.

The Court in *Marine Midland* initially focused on the nature of the interest taken by the Government in order to determine whether the Government's possessory right

to the property resulted in a compensable taking. After analyzing the enabling legislation and regulations as well as the text of the "title vesting" clause itself, the Court proceeded to distinguish a fairly large and impressive body of precedent, concluding:

> In sum, we hold that the Government's title vesting clause and regulations provide for the taking of an interest in the nature of a lien. Full title, in the plain sense, certainly is not meant, as an examination of the clause and regulations show. We recognize that the Government's use of the word "title" has had an important history, both to avoid the ban on advances of public money and as a way to circumvent floating lien interests of general creditors, and that it has an important present use in insuring that the Government may take actual possession of the inventory of a bankrupt contractor. There is no other reason, however, in theory or case law to read the word for more than that.

*Marine Midland,* 687 F.2d at 403–04. The Court then went on to hold that as to the priority of the conflicting security interests between the Government and the bank, the rule of decision "is to make the Government's security interest under its title vesting procedures paramount to the liens of general creditors." *Id.* at 404.

Although the Government "won" the *Marine Midland* case, in that it was found to have a paramount lien interest, it is *possible* that if the Court's reasoning were applied to the instant case, the result would be different, requiring a judgment for APF. This is because of a case relied on by APF entitled *United States v. Lennox Metal Mfg. Co.,* 225 F.2d 302 (2d Cir.1955). In that case, the Court apparently assumed that the interest held by the Government, on the peculiar facts of the dispute, was in the nature of an equitable lien. *Id.* at 317 (opinion of Medina, J., and Hincks, J.). After so finding, the Court then went on to

hold that this lien could not be asserted by the Government because of its inequitable conduct in its relationship with Lennox. Thus, *if* the Government in this case possesses a lien interest, and *if* it wrongfully terminated its contract with APF, it might be foreclosed from asserting its interest under the contract by a combined reading of *Lennox* and *Marine Midland.* It is for this reason that this Court must determine whether *Marine Midland* was in fact correctly reasoned. As has already been stated, the Court has concluded that it was not.[2]

### B. Statutory and Regulatory Framework

It is impossible to explain the nature of the interest established by the "title vesting" clause of the Government's contract with APF without first providing some background. The "title vesting" clause is simply one element of a scheme of federal procurement based on "progress payments." Such payments are unique, and it is this uniqueness which gives rise to the peculiar rights possessed by the Government in this case. As a preliminary matter, it is essential to identify the distinctions between "progress payments" and "advance payments," (two terms of art in this area of law) before the Government's interest may be defined properly. It is to those distinctions, found in the enabling legislation, regulations, and administrative practices, to which the Court now turns.

The starting point for this discussion is the definitions of these two types of payments. Those definitions are contained in the applicable regulations. Both terms contemplate payment in advance of full completion of a contract. "Progress payments," however, are payments made as work progresses, and are determined on the basis of costs incurred, percentage of work completed, or the stage reached in a particular project. 32 C.F.R. § 163.11 (1982). "Progress payments" thus presume some performance under the contract, even

---

**2.** This entire discussion, of course, assumes that *Lennox,* in addition to *Marine Midland* was correctly decided. That assumption is very much in doubt. *See* Pasley, *The Interpretation of Government Contracts: A Plea For Better* *Understanding,* 25 Fordham L.Rev. 211, 236–37 (1956); Whalen, *Government Supply Contracts: Progress Payments Based on Costs; The New Defense Regulations,* 26 Fordham L.Rev. 224, 230 (1957).

though they are made prior to acceptance by and delivery to the Government of the finished product. "Advance payments," while also made well before acceptance and delivery, do not require any performance, but rather are made "prior to, in anticipation of, and for the purpose of complete performance under a contract or contracts." 32 C.F.R. § 163.9 (1982).

As can be seen by these descriptions, "advance payments" operate on the order of a loan, while "progress payments" are more in the nature of purchases. As was noted over a quarter of a century ago:

> It has long been recognized and understood that an "advance payment" is a loan by the Government and can be made "only upon adequate security" ... but "partial payments" ["progress payments"[3]] are payments made by the Government in purchase of materials and are authorized when ownership thereto vests in the Government.

*City of Detroit v. Murray Corp.,* 355 U.S. 489, 517–18, n. 4, 78 S.Ct. 458, 465, 2 L.Ed.2d 441 (1958) (Whittaker, J., dissenting).

This fundamental, historical difference between "progress payments" and "advance payments" is easily discerned in the enabling legislation.[4] The relevant statutory provision, 10 U.S.C. § 2307(a)(1), provides

that the head of any agency is authorized to make "advance," "partial," "progress," or "other" payments. But whereas subsections (b) and (d) refer to "[p]ayments made under subsection (a)" (that is, all payments), subsection (c) singles out "advance payments made under subsection (a)," and requires that such payments have "adequate security" which may be in the form of a "lien," "paramount to any other liens."

Further evidence of the distinction between "progress payments" and "advance payments" can be found in the applicable regulations.[5] 32 C.F.R. Part 163 implements the authorization to make "advance payments" and "progress payments" under 10 U.S.C. § 2307 (1976). Subpart D pertains to "Advance Payments" and provides information on "Interest" (§ 163.53) and "Security" (§ 163.63). "Advance payment provisions" are set out in § 163.64–2 and include contract clauses for "Interest charge" (§ 163.64–2(f)), "Lien on special bank account" (§ 163.64–2(h)), and "Lien on property under contract" (§ 163.64–2(i)). In contrast, Subpart E pertains to "Progress Payments Based on Costs," but contains no information on liens or security. Section 163.79–2 sets forth the "Progress Payment clause for small business concerns," which is identical to that contained

---

**3.** In the past, the term "partial payments" has been used to describe what are now consistently called "progress payments." Whalen, *Government Supply Contracts: Progress Payments Based on Costs; The New Defense Regulations,* 26 Fordham L.Rev. 224, 230, n. 25 (1957).

**4.** 10 U.S.C. § 2307 (1976) provides:

"§ 2307. Advance payments.

(a) The head of any agency may:

(1) Make advance, partial, progress, or other payments under contracts for property or services made by the agency; and

(2) Insert in bid solicitations for procurement of property or services a provision limiting to small business concerns advance or progress payments.

(b) Payments made under subsection (a) may not exceed the unpaid contract price.

(c) Advance payments made under subsection (a) may be made only if the contractor gives adequate security and after a determination by the head of the agency that to do

so would be in the public interest. Such security may be in the form of a lien in favor of the United States on the property contracted for, on the balance in an account in which such payments are deposited, and on such of the property acquired for performance of the contract as the parties may agree. This lien is paramount to any other liens. (d) Payments under subsection (a) in the case of any contract, other than partial, progress, or other payments ..."

**5.** Interpretive regulations by officers, departmental heads, and others charged with the duty of administering a statute, as well as those persons' practices which reflect their understanding of provisions they are required to carry out, have great weight in determining the operation of a statute. *Norwegian Nitrogen Products Co. v. United States,* 288 U.S. 294, 53 S.Ct. 350, 77 L.Ed. 796 (1933); *United States v. Clark,* 454 U.S. 555, 561–62, 102 S.Ct. 805, 809–810, 70 L.Ed.2d 768 (1982); *See generally* Sutherland, *Stat. Const.* § 49.05 (4th Ed.).

in the Government's contract with APF. Section 163–79–2(d) is the "title vesting" clause.

The different treatment accorded to "advance payments" and "progress payments" in the current statute and regulations is not accidental, but rather is a result of historical development. That development has a crucial impact on this lawsuit, in that one of its consequences has been that "title vesting" and government ownership have become associated with "progress payments," while "liens" have become associated with "advance payments." That historical development is thus the next topic to which the Court's attention must be directed.

### C. *Historical Development*

Prior to 1958, when Congress amended 10 U.S.C. § 2307 to include "partial," "progress," and "other" payments, some commentators[6] believed that the practice of making "progress payments" was prohibited by Rev.Stat. 3648 (1873) *as amended,* 31 U.S.C. § 3324 (1982).[7] In part, it was this supposed prohibition which caused the Court in *Marine Midland* to reject wholesale the preceding line of cases which interpreted "title vesting" clauses as creating absolute title. The Court reasoned that the

> government's use of the word 'title' has had an important history, [and in part has been inspired by the desire to] . . . *avoid the ban on advances of public money . . .*

*Marine Midland,* 687 F.2d at 403–404 (emphasis added). Thus, the Court asserted, cases interpreting the word "title" must be recognized as coming

> from a legal setting in which it was necessary to characterize title vesting fairly literally in order to preserve the legality of the government's practice of making progress payments . . .

**6.** McClelland, *The Illegality of Progress Payments as a Means of Financing Government Contractors,* 33 Notre Dame Law. 380 (1958).

**7.** Rev.Stat. § 3648 (1873), as amended, 31 U.S.C. § 3324 (1982) provides:

§ 3324. Advances

(a) Except as provided in this section, a payment under a contract to provide a service or deliver an article for the United States

*Id.* at 400. This Court's independent analysis of the historical underpinnings of the earlier cases leads it to a different conclusion than that reached by the *Marine Midland* Court, however.

As early as 1885, the United States Attorney General held that while Rev.Stat. 3648 (1873) *as amended,* 31 U.S.C. § 3324 (1982), *see* n. 7, *supra.,* on its face was prohibitory (as it still is), it was not intended to bar payments for work in progress when the amount of the payment had been earned by the contractor. This administrative interpretation, which became known as the "equivalent benefit theory," 18 Op.Atty. Gen. 105 (1885), was subsequently accepted by accounting officers of the Government, 17 Comp.Dec. 894 (1911); 1 Comp.Gen. 143 (1921).

By 1941, the "equivalent benefit theory" had fully matured into its modern form, aligning "title vesting" with "progress payments" and liens with "advance payments." As the Comptroller General stated in that year,

> While, under prohibition of the Statute [Rev.Stat. § 3648 (1873), as amended, 31 U.S.C. § 3324 (1982)], articles in which the United States has acquired no right or interest and from which it derives no benefit, payment may be made for articles in advance of their actual possession of the United States if title therein has vested in the Government at the time of such payment [as with progress payments], or if articles are impressed with a valid lien in favor of the United States in an amount at least equal to the payment [as with advance payments].

20 Comptr.Gen. 917 at 918 (1941) *quoted in* Bachman, *Defense Department Contract Financing,* 25 Geo.Wash.L.Rev. 228, 229, n. 3 (1957). This alignment was so fully a

Government may not be more than the value of the service already provided or the article already delivered.

(b) An advance of public money may be made only if it is authorized by

(1) a specific appropriation or other law, or

. . .

*See also McClelland,* footnote 6, *supra.*

part of administrative practice, that in 1958, when 10 U.S.C. § 2307 was amended to include progress payments, some questioned why such an amendment was· even necessary.[8]  Ultimately, the two types of payments with their unique attributes resulted in the two distinct forms of federal procurement found in the current statute and regulations.  The distinction, although often not addressed specifically, certainly must have influenced case law interpreting "title vesting" clauses in federal procurement contracts.  In fact, it is this Court's belief that the relevant case law cannot be understood without this background, because the historical developments form the fundamental, albeit unstated, assumptions on which the opinions are based.  Because the courts can be assumed to have accepted the almost universally-held belief that progress payments were legal, it is reasonable to believe that, contrary to *Marine Midland's* view, those courts did *not* interpret "title vesting" clauses merely with the goal of "preserving the legality" of the Government's procurement practices, *see* p. 1020, *supra.*  Rather, this Court believes that the legality of such payments was simply, and properly, taken for granted, allowing the Courts to proceed to the straight-forward task of contract interpretation.  That interpretation is discussed below.

### D.  Case Law

"Title vesting" clauses have reached the Supreme Court on more than one occasion.  In the leading case interpreting such clauses, the Supreme Court stated:

> [I]t is . . . well settled that if the contract is such to clearly express the intention of the parties that the builder shall sell and the purchaser shall buy the ship before its completion, and at the different stages of its progress, and this purpose is expressed in the words of the contract, it is binding and effectual to pass the title.  [Citations

omitted.]  All sections of the agreement must be read in the light of the purposes of the contracting parties as gathered from the entire contracts, and must be considered in connection with other provisions of the contract.

*United States v. Ansonia Brass & Copper Co.,* 218 U.S. 452, 467, 31 S.Ct. 49, 54 L.Ed. 1107 (1910).  The Court then considered the provisions of the contract that the defendant contended were *inconsistent* with ownership, namely, 1) the requirement that the contractor insure the property and 2) the fact that the Government maintained the right to reject the final product.  In conclusion, the Court stated:

> Construing the whole contract, we find nothing in its other provisions which cuts down or lessens the binding force of the clear and distinct provisions . . . as to ownership.  The parties therein dealt with a specific part of the contract, they expressed themselves clearly upon the subject, and it is not to be presumed, in the absence of clear expression or necessary implication, that they intended to supersede this provision in dealing with other specific and general parts of the agreement.

*Ansonia,* 218 U.S. at 469, 31 S.Ct. at 53.

In *United States v. County of Allegheny,* 322 U.S. 174, 64 S.Ct. 908, 88 L.Ed. 1209 (1944), a tax case, the Supreme Court again confronted a "title vesting" clause.  There, the contract provided that the Government acquired machinery through Mesta (the contractor) upon inspection and acceptance—events which actually took place.  The Supreme Court held that title (ownership) vested in the Government.

More recently, in *City of Detroit v. Murray Corp.,* 355 U.S. 489, 78 S.Ct. 458, 2 L.Ed.2d 441 (1958), the Supreme Court dealt with the taxation of personal property ac-

---

**8.**  In reviewing the proposed 1958 amendment to 10 U.S.C. § 2307, Robert Dechert, General Counsel of the Department of Defense, commented:

> "[T]his Department has long considered that it had adequate authority in law to make . . . progress payments under appropriate con-

tractual agreements . . . ."  Senate Comm. on Government Operations, Small Business Concerns—Opportunities to Obtain Government Purchases and Contracts, S.Rep. No. 2201, 85th Cong., 2d Sess., reprinted in 1958 U.S. Code Cong. & Ad.News 4021, 4032.

quired by Murray Corporation pursuant to contract provisions almost identical to those presently before this Court, see n. 1, supra. Specifically, the "title vesting" clause provided that in return for "progress payments," title to certain parts, materials, and other contract properties, when acquired by the contractor, would vest in the Government. Additionally, the clause provided that (1) title to certain property vested in the Government both before and after payment was made; (2) the contractor retained possession; (3) the contractor would have to replace qualitatively defective "title vested" property at its own expense; (4) the contractor bore the risk of loss; (5) "left-over" items revested in the contractor; (6) the custodial regulations usually applicable to the handling of Government property in the possession of contractors were not applicable to "progress payment" property; and (7) the Government was not primarily interested in acquiring the "progress payment" property as such, but rather in acquiring the contract end item which was to be manufactured, processed, fabricated, etc., out of the "progress payment" property. Id. at 514–16, 78 S.Ct. at 463–464, 465 (Whittaker, J., dissenting). All of the above conditions are contained in the contract entered into in this case between the Government and American Pouch Foods.

The majority of the Court assumed without deciding that the Government had title to the "progress payment" property. Id. at 492, n. 2, 78 S.Ct. at 460, n. 2. On the other hand, Justice Whittaker, joined by Justices Frankfurter, Burton, and Harlan, faced the title issue squarely. After thoroughly analyzing the apparently inconsistent contract provisions, Id. at 519–24, 78 S.Ct. at 466–469, Justice Whittaker concluded: "I believe that ... the contracts in question

conveyed full beneficial title—all elements of title and incidents of ownership—in the materials to the Government." Id. at 524, 78 S.Ct. at 469. With respect to Ansonia Brass, Justice Whittaker noted: "This Court ... held that the contract—containing title vesting provisions almost identical with the ones here—conveyed full ownership of the unfinished vessel—not a mere lien—to the Government. The principles of that decision appear to have been followed in every decided case in this country save one." Murray, 355 U.S. at 523–24, 78 S.Ct. at 468–469. (Citations omitted.) [9]

Since Ansonia, lower courts have confronted "title vesting" clauses on several occasions. See generally, In re Murdock Machine & Eng. Co. of Utah, 620 F.2d 767 (10th Cir.1980); United States v. Digital Products Corp., 624 F.2d 690 (5th Cir.1980); In re Double H Products, 462 F.2d 52 (3d Cir.1972); Shepard Engineering Co. v. United States, 287 F.2d 737 (8th Cir.1961); In re American Boiler Works, 220 F.2d 319 (3rd Cir.1955); United States v. Lennox Metal Manufacturing Co., 225 F.2d 302 (2d Cir. 1955); In re Greenstreet, Inc., 209 F.2d 660 (7th Cir.1954); In re Read-York, 152 F.2d 313 (7th Cir.1945); United States v. Matadure Corporation, CV 80–0460, slip op. (E.D. N.Y. April 17, 1980); United States v. Buder, 414 F.Supp. 1 (E.D.Mo.1975) affirmed 538 F.2d 333 (8th Cir.1976); United States v. Ameco Electronic Corporation, 224 F.Supp. 783 (E.D.N.Y.1963); Marine Midland Bank v. United States, 687 F.2d 395 (Ct.Cl.1982); Boeing Co. v. United States, 168 Ct.Cl. 109, 338 F.2d 342 (1964), cert. den. 380 U.S. 972, 85 S.Ct. 1331, 14 L.Ed.2d 269 (1965). As has already been stated, of those cases, only two have considered the "title vesting" clause as creating a lien interest in

---

**9.** The case referred to by Justice Whittaker (which provided the last occasion on which the Supreme Court confronted the "title vesting" clause) is American Motors Corp. v. City of Kenosha, 274 Wis. 315, 80 N.W.2d 363 (1957), aff'd, 356 U.S. 21, 78 S.Ct. 559, 2 L.Ed.2d 578 (1958) (per curiam). But see, contra, State ex rel. Superior Shipbuilding Company v. Buckley, 175 Wis. 272, 185 N.W. 199 (1957); See also Whelan, Government Contract Privileges: A

Fertile Ground For State Taxation, 44 Va.L. Rev. 1099, 1109–10, n. 54 (1958). In American Motors, the Wisconsin Supreme Court held that "title" was a matter for federal law not state law, but "ownership" was to be determined by the state. Because the United States Supreme Court affirmed the decision per curiam without opinion, we are left to speculate as to the rationale of the majority.

the Government, see pp. 1017–1018, *supra.*

For the reasons already set forth, the Court has decided to follow the clear consensus of the precedent. As the Third Circuit explained:

> Contentions such as these [that the "title vesting" clause creates a lien] have frequently been advanced over the years in attempts to escape the effect of the title-passing provisions of fixed-price Government contract partial [progress] payment clauses. "At least to the extent of the partial [progress] payments, the courts have, in a variety of situations, almost unanimously sustained the provision as effecting a full and complete passage of title or ownership, and as not creating only a lien or security interest." *Boeing Company v. United States,* 168 Ct.Cl. 109, 338 F.2d 342, 345 (1964), *cert. denied,* 380 U.S. 972, 85 S.Ct. 1331, 14 L.Ed.2d 269 (1965).

*In re Double H Products Corporation,* 462 F.2d 52, 55 (3d Cir.1972) *see also In re Read-York,* 152 F.2d 313, 316 (7th Cir.1945).

One final note is in order. As part of its argument, APF claims that as a debtor-in-possession, it is vested with all the powers and authority of a creditor, without notice, who obtained a judicial lien on the date of bankruptcy, regardless of whether such creditor exists. 11 U.S.C. § 544(a) (1976). As such, APF claims that its interest is clearly and unequivocally paramount to that of any unperfected security interest such as that asserted by the Government.

Because the Court has already concluded that as a matter of law the Government holds absolute title to the property, APF's argument fails. But even if it could be said that the Government simply took a lien in the described inventory to secure its progress payments, in light of 10 U.S.C. § 2307(c) (1976), *see* n. 4, *supra,* the Govern-

ment's lien would be paramount. Moreover, that lien would be paramount without regard to the perfection requirements of state law.[10] *United States v. County of Allegheny,* 322 U.S. 174, 64 S.Ct. 908, 88 L.Ed. 1209 (1944); *Clearfield Trust Co. v. United States,* 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943); *In re Read-York,* 152 F.2d 313 (7th Cir.1945). Finally, because such a lien would in effect be created by contract, it would not be a statutory lien subject to avoidance under 11 U.S.C. § 544(a) (1976). *Lawrence v. United States,* 378 F.2d 452 (5th Cir.1967).

■ For all of the foregoing reasons, this Court holds that the Government possesses full, absolute title in the property covered by the title vesting clause.

## II. APF's Counterclaim for Wrongful Termination

As has already been stated, on December 5, 1980, the Government filed an adversary complaint in the Bankruptcy Court. The complaint was designated as a complaint for relief from automatic stay. On January 16, 1981, APF filed an answer and counterclaim. In its counterclaim, APF alleged that the Government's termination of its contract with APF was unlawful and improper because 1) APF's delay was excusable, 2) the standards applied by the government to APF were arbitrary, and 3) the termination denied APF its right to due process under the Fifth Amendment. APF further alleged that because of the Government's unlawful and improper termination, it sustained damages in the aggregate sum of $13,250,000.

■ On February 17, 1983, the reference to the Bankruptcy Court was withdrawn and the action was transferred to this Court for adjudication. The Government now moves in this Court for dismissal of the

---

**10.** *United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979) does not change this pronouncement. In *Kimbell,* the Court declared that the question of priorities is one of federal law, but chose as its rule of decision state enactments of Article 9. *Kimbell* specifically left open, however, the ability of the courts to fashion uniform rules in cases that required it, 440 U.S. at 740, 99 S.Ct. at 1464–1465. With respect to federal procurement, resort to state laws would be "contrary to evident congressional intent and established federal practice." *Marine Midland Bank v. United States,* 687 F.2d 395, 404 (Ct.Cl.1982).

counterclaim. The Government claims two grounds for dismissal: 1) the Contract Disputes Act of 1978 precludes this Court's jurisdiction, and 2) the counterclaim is barred by the doctrine of sovereign immunity. Alternatively, the Government asks that even if this Court finds that it has the power to reach the merits of the counterclaim, it should, in its discretion, abstain from exercising that power pursuant to 28 U.S.C. § 1471(d) (Supp. II 1978). The Court believes the latter approach is the appropriate one, and has decided to abstain. In so doing, no view is expressed on the merits of the Government's assertion of sovereign immunity. On the other hand, since the Contract Disputes Act of 1978 did not become effective until March 1, 1979, and since the contract between the Government and APF was entered into on January 29, 1979, the Government's arguments concerning the applicability of that Act to this case are specifically rejected. Contract Disputes Act of 1978, effective March 1, 1979, Pub.L. No. 95–563, 92 Stat. 2383 (1978), 41 U.S.C. § 601–613 (Supp. II 1978). *See also Tuttle/White Constructors, Inc. v. United States,* 656 F.2d 644, 646 (Ct.Cl.1981).

With respect to its decision to abstain, the Court notes that its jurisdiction over the counterclaim is predicated on 28 U.S.C. § 1471 (Supp. II 1978). Subsection (b) empowers this Court with "original but not exclusive jurisdiction of all civil proceedings arising under Title 11." Subsection 1471(d) provides:

> Subsection (b) ... of this Section does not prevent a district court ... in the

interest of justice, from abstaining from hearing a particular proceeding arising under Title 11 or arising in or related to a case under Title 11. Such abstention, or a decision not to abstain is not reviewable by appeal or otherwise.

APF's counterclaims, although arising out of a petition for reorganization under Title 11, are, nevertheless, in essence, Government contract disputes. Because such disputes involve a very specialized area of the law, institutions such as the Armed Services Board of Contract Appeals and the Court of Claims have been created and specifically designed to resolve them. *See, Matter of Gary Aircraft Corp.,* 698 F.2d 775, 784 (5th Cir.1983). (ASBCA provides expertise, uniformity and speed in resolving Government contract disputes); *In re Verco Industries,* SA 80–0845 (Bankr.C.D.Cal. August 24, 1981), slip op. at 3. (Court of Claims provides expertise resulting from history of exclusive jurisdiction in Government contract disputes).

This Court, therefore, in the interest of justice, abstains from hearing APF's counterclaim, and APF is directed to reassert its claim before either the Board of Contract Appeals or the Court of Claims.

IT IS SO ORDERED.