UNITED STATES of America, Plaintiff-Appellant Cross-Appellee,

v.

DIGITAL PRODUCTS CORPORATION, Defendant-Appellee Cross-Appellant.

No. 77–2171.

United States Court of Appeals, Fifth Circuit.

Aug. 22, 1980.

---

Al J. Daniel, Jr., Atty., Civ. Div., Appellate Section, Dept. of Justice, Washington, D.C., for the U.S.

Lerner, David, Littenberg & Samuel, Richard I. Samuel, John R. Nelson, Westfield, N.J., N. James Turner, Miami, Fla., for Digital Products Corp.

Before TUTTLE, FAY and THOMAS A. CLARK, Circuit Judges.

THOMAS A. CLARK, Circuit Judge:

This Government defense contract case presents a narrow issue. Is the United States ("Government") entitled to replevy personal property to which it has title from a defense contractor, Digital Products Corporation ("Digital"), that has held the property since the contractual relationship between the two collapsed in early 1976, pending resolution of their contractual dispute by the Armed Services Board of Contract Appeals ("ASBCA")? The district court found that although title to the property in question was vested in the Government, Digital was entitled to continue to hold the property because the Government had failed to "terminate" the contract in strict accordance with its terms. Furthermore, the district court held that it was without jurisdiction to resolve the factual disputes surrounding the contract because those disputes should first be subjected to administrative review by the Armed Services Board of Contract Appeals. We find that the district court correctly answered a portion of the jurisdictional question respecting ASBCA [1] but erred in permitting the de-

---

1. This issue has been put to rest by the Supreme Court in *Crown Coat Front Co., Inc. v. United States*, 386 U.S. 503, 87 S.Ct. 1177, 1182, 18 L.Ed.2d 256 (1967).

With respect to claims arising under the typical government contract, the contractor has agreed in effect to convert what otherwise might be claims for breach of contract

fense contractor to maintain possession of the Government's property.

■ Before referring to the facts, we should emphasize that this litigation involves a Government armed services contract. The product being manufactured for the Government was an item required in the National Defense Program. At the beginning of the decision-making process case we have the public policy determination of the Government's possessory right to property manufactured for the defense program. The fact that the country is not engaged in a war does not render any less vital the right of the Government to demand and obtain immediate possession of property to which it has title. Already firmly entrenched in our jurisprudence is that factual disputes surrounding such contracts must be resolved by the ASBCA, as was properly found by the district court in this case. We hold that in cases involving termination of Government contracts, where the product is part of the national defense effort, the jurisdiction of the district courts does not embrace any issue beyond that of title, so long as the Government represents in its complaint that the contract had been terminated. To hold otherwise would permit a contractor to plead and litigate factual issues surrounding the termination, and delay delivery of vitally-needed defense products. If the contract is wrongfully or improperly terminated, that is a dispute to be resolved by the ASBCA, and not the district court. In this case the district court held that ASBCA had to settle the dispute between the parties, and then itself proceeded to settle a dispute as to the validity, form, and nature of the termination.

The material facts in this case are undisputed. The Government awarded Contract No. N00421–75–C–0126 to Digital on December 16, 1974. This fixed price defense contract obligated Digital to deliver 18 "digital magnetic tape transport interface assemblies" (MDTI's) to the Department of the Navy beginning June 13, 1975. The contract provided, inter alia, that title to all parts, materials, inventories, work in progress, and all like property acquired or produced by Digital and property chargeable or allocable to the contract vested immediately in the Government upon such acquisition, production, or allocation. The property, possession of which is the subject of this appeal, was acquired or produced by Digital for use in completing performance of the contract. The contract included standard "Default" and "Termination For Convenience of Government" clauses.

Although work on the computer equipment progressed through most of 1975, relations between the Government and Digital steadily deteriorated as disputes between the parties ensued over delivery schedules, progress payments, the financial difficulties of Digital, adjustments to the contract price, and whether the equipment met contract specifications. This deterioration culminated on January 7, 1976, when Digital's president sent the following telegram to the Government's contracting officer:

> Digital Products Corporation hereby terminates all efforts on subject contract [. T]his action is necessary due to lack of effort on the part of NAS [Naval Air Station] in adjusting contract value for the amendments costs and spare parts order . . ..

There followed an exchange between the parties which is reproduced by footnote.[2]

---

into claims for equitable adjustment. . . . The contractor must present his claim to the contracting officer, whose decision is final unless appealed for final action by the department head or his representative, here the Armed Services Board of Contract Appeals. Until that Board has acted, the contractor's claim is not subject to adjudication in the courts. . . .

It is now crystal clear that the contractor must seek the relief provided for under the

contract or be barred from any relief in the courts. [Footnote omitted.]

2. The Government responded in a letter of January 15 to Digital in pertinent part as follows: Contract N00421–75–C–0126, dated 16 December 1974, is hereby terminated for default in accordance with the General Provision of the subject contract entitled "Default".
Your abandonment of the contract as stated in your message dated 7 January 1976 is an anticipatory breach of contract. Pursuant to

Digital refused to deliver to the Government the completed supplies and manufacturing materials when demanded.

The Government sought recovery of the property in Digital's possession and damages. The district court denied the Government's motion seeking immediate possession of the property which motion was based on national defense considerations. The court denied the Government's motion for summary judgment and granted summary judgment for Digital, the pertinent portions of the court's order appearing in the footnote.[3]

the Default clause, all completed supplies and manufacturing materials shall be delivered to the Government. Delivery instructions will be furnished by separate letter. Pursuant to this termination of default, your right to proceed further with performance of this contract is terminated. . . .

On January 16 Digital wrote the Government Contracting Officer as follows:

This letter is hereby submitted to confirm our offer to complete checkout of the prototype DMTI presently on-site at NAS. This offer is made with complete cognizance of the Default Notice presently in transit and without obligation on the part of NAS.

The length of time required to complete this task is 3–5 days which can certainly benefit NAS in their determination as to disposition of work necessary to complete the remaining 15 units. It is felt that a savings to the government can be realized by this approach and should therefore be considered seriously.

On January 27, 1976, the Contracting Officer wrote Digital the following letter:

Your request of 16 January 1976 to complete the checkout of the prototype DMTI delivered under contract N00421–76–C–0126 is denied. In accordance with the Default Notice all effort under this contract has been terminated.

On January 30, 1976, Digital sent a telegram to the Contracting Officer, the pertinent parts of which are as follows:

. . . IN RESPONSE TO YOUR TERMINATION FOR DEFAULT DATED 1–16–76 WHICH WE RECEIVED 1–21–76 WE DISAGREE THAT WE HAVE ANTICIPATORILY BREACHED OUR CONTRACT

IF WE ANTICIPATORILY BREACHED THE CONTRACT WE BELIEVE OUR LETTER 1–16–76 CURED THAT ANTICIPATORY BREACH

IF OUR LETTER 1–16–76 DID NOT CURE THE ALLEGED ANTICIPATORY BREACH WE HEREBY REVOKE OUR ENTIRE MESSAGE DATED 1–7–76 AND THEREBY CURE THE DEFAULT ALLEGED

PLEASE ADVISE WHEN WE SHOULD SEND OUR PEOPLE TO COMPLETE INSTALLATION AND CHECK OUT OF THE PROTO–TYPE UNIT WE ARE PROCEEDING UNDER THE CONTRACT WHICH EXISTS

On February 5, 1976, the Contracting Officer wrote Digital a letter as follows:

This letter is in response to your telegram of 30 January11976. [sic] The Naval Air Station letter of 15 January 1976 terminating contract N00421–75–C–0126 for default for anticipatory breach of contract was a final determination of the Contracting Officer and will not be reconsidered.

We are returning your unit submitted 24 November 1975 under the contract since it failed acceptance testing prior to the anticipatory breach and subsequent termination for default.

Your attention is directed to the termination for default letter of 15 January 1976 which details the appeals procedures.

**3.** The district court's order of March 31, 1977, states in part:

The court must conclude that defendant's mailgram of January 7, 1976, was an anticipatory breach. See *United States v. Seacoast Gas Co.*, 204 F.2d 709 (5th Cir. 1953). The court is further convinced that at the time of the breach, title was vested in plaintiff. *United States v. Ansonia Brass & Copper Co.*, 218 U.S. 452, 31 S.Ct. 49, 54 L.Ed. 1107 (1910). The questions to be answered are:

1. Whether plaintiff must follow the contract and regulations regarding termination in order to obtain possession of the property; and

2. If the answer to that question is "no", by what means, if any, might plaintiff obtain possession.

Plaintiff asserts that the contract language permits the conclusion that, in fact, the contractual provisions and applicable regulations were followed. [footnote omitted] However, the provisions subsection (a)(i) of the default do not embrace an anticipated (however well-founded) failure of timely delivery, but rather the fact of such failure. It would seem clear that such action as was taken by defendant "endanger]ed] [sic] performance of this contract" within the meaning of subsection (a)(ii). Nor can the plaintiff succeed by relying upon the Termination for Convenience Clause, see 32 C.F.R. § 7.103–21, in the manner suggested. That contractual provision, see 32 C.F.R. § 7.103–21(e), permits automatic termination for convenience where it appears that the contractor was not in default. The court has found otherwise. Thus, plaintiff may terminate for convenience, but only by following the provisions set forth in Termination for Convenience Clause, including the issuance of the proper notices.

■ We do not concur in the district court's conclusion that the contractor was in default under terms that required a curative period, and thus we do not believe the ten-day cure clause was applicable. The contractor's telegram of January 7 clearly states that it "hereby terminates all efforts on subject contract." This ended the contract. This was a repudiation by the contractor. The Government was not required to follow the prescribed termination procedures contained in the contract after the contract was terminated by Digital. It is unfortunate that the contracting officer, on January 15, stated that the contract was "terminated for default in accordance with the General Provision of the subject contract entitled 'Default' " and labeled Digital's abandonment of the contract as an anticipatory breach. It would have been better if he had merely accepted Digital's termination. However, nothing contained in that letter or his letters of January 27 and February 5 gave Digital any reason to believe that it could rescind its repudiation of the contract. Thus, we conclude that Digital terminated the contract by its telegram of January 7.

The Government, with good basis, argues an alternative reason why the trial court should have considered the contract terminated. The Default clause, which the district court believed ensnared the Government with a ten-day "cure" burden, contained the following paragraph:

(e) If, after notice of termination of this contract under the provisions of this clause, it is determined for any reason that the Contractor was not in default under the provisions of this clause, or that the default was excusable under the provisions of this clause, the rights and obligations of the parties shall, if the contract contains a clause providing for

termination for convenience of the Government, be the same as if the notice of termination had been issued pursuant to such clause.

■ The contract with Digital did have a Termination for Convenience of the Government clause. Simply stated, this clause permitted the Government to terminate the contract without any cause, at its convenience, to take title and possession of the product being fabricated and the work in progress, and then settle with the Contractor. Thus, reading together subparagraph (e) of the Default clause and the Convenience clause, it is obvious that *if* the Government erred in its ground for termination (such as the Contractor *not* being in default, or the default being excusable) the termination was nevertheless effective under the Convenience clause.

A Court of Claims case offers guideposts with respect to the convenience-termination provision as follows:

The rule we have followed is that, where the contract embodies a convenience-termination provision as this one would, a Government directive to end performance of the work will not be considered a breach but rather a convenience termination—if it could lawfully come under that clause—even though the contracting officer wrongly calls it a cancellation, mistakenly deems the contract illegal, or erroneously thinks that he can terminate the work on some other ground. [Citations omitted.] The principle underlying these decisions is that a party to a contract may "justify an asserted termination, rescission, or repudiation, of a contract [which turns out not to be well grounded] by proving that there was, at the time, an adequate cause, although it did not become known to him until later." *College Point Boat Corp. v.*

---

Plaintiff has fallen prey to its own regulations and contract clauses. Since defendant had not failed to timely deliver, plaintiff may terminate for default only by permitting a 10 day cure. Thus, its purported notice of termination, without allowing for such a cure, was ineffective and could not serve as a basis for converting the termination into one for the convenience of the government. Plaintiff must follow its own contractual provisions if it expects the court to enforce such provisions against defendant.

*United States,* 267 U.S. 12, 45 S.Ct. 199, 69 L.Ed. 490 (1925).[4]

Although the contract terms were somewhat different, we find that the Third Circuit has spoken on the subject of public policy requirements with respect to defense material contracts in terms which we approve.[5]

But one does not need a citation of decided cases to understand the language above quoted in Article 3 of the contract between the parties. It is as clear as English words can make it. The title, both to the vessels and to materials, vested in the government with no ifs, ands or buts. And without any mention of payment as a prerequisite thereto.

The appellant calls attention to Article 8 of the contract which has to do with default. He argues that the provision that following termination the government may require the contractor to transfer title is meaningless if Article 3 covers the whole situation. We do not think he is right. The very provision relied upon has a parenthetical clause ("insofar as not previously transferred") which is apposite to the clause with regard to transfer of title by the contractor. We think that the language just referred to, put in out of abundant caution, must not be read to qualify the clear and conclusive language of Article 3 above set out.

The language of the article is designed to protect the rights of the government. After all, this is a contract made by an agency charged with the national defense and it is quite understandable that prompt and decisive action is required when a contractor is unable to carry out his agreement. Regardless of whether the reason back of the provision is beneficent or harsh, however, here we have the sovereign making a contract. In the absence of constitutional inhibitions the sovereign can make such contract as it pleases and no one can object. . . .

Our discussion with respect to the validity of the termination of the contract is dicta. It is not intended to be dispositive of the issue to be decided by ASBCA. We have no more jurisdiction to decide those issues than does the district court. Our discussion has been for the purpose of illustrating the different routes such a dispute can take and emphasizing the absolute necessity that district courts determine property rights and ASBCA determine contract rights.

 In conclusion, we hold that it is immaterial whether the termination by the Government was improper. But we say further that in termination of armed forces contract involving production of defense materials, the Government's declared act of termination, right or wrong, permits it to replevy goods to which it has title, after demand, and the district court's jurisdiction is thus limited to the issue of title only.

We REMAND for entry of judgment ordering relinquishment by defendant to plaintiff of the property in controversy.

---

**4.** *G. C. Casebolt Co. v. United States,* 421 F.2d 710, 712, 190 Ct.Cl. 783 (1970).

**5.** *American Boiler Works, Inc., Bankrupt,* 220 F.2d 319, 321 (3rd Cir. 1955).