769 F.2d 1190
 33 Cont.Cas.Fed. (CCH) 73,772, 41 UCC Rep.Serv. 972
 In re AMERICAN POUCH FOODS, INC., Debtor-Appellant.
 No. 83-2530.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 13, 1984.
Decided July 30, 1985.
 
 Richard J. Mason, Levit, Miller & Mason, Chicago, Ill., for appellant.
 Kenneth Oestreicher, U.S. Justice Dept., Civil Div., Washington, D.C., for appellee.
 Before FLAUM, Circuit Judge, and SWYGERT and FAIRCHILD, Senior Circuit Judges.
 FAIRCHILD, Senior Circuit Judge.
 
 
 1
 In a reorganization proceeding under Chapter 11 of the Bankruptcy Code the district court decided, in response to a complaint by the United States, that the United States held absolute title (and right to possession) to certain goods in the possession of the Debtor, American Pouch Foods, Inc. (Pouch). The court abstained from hearing Pouch's counterclaim. In Re American Pouch Foods, Inc., 30 B.R. 1015 (D.C.N.D.Ill.1983). Pouch appeals. We affirm.
 
 
 2
 In January 1979, Pouch entered into a procurement contract with the United States Defense Logistics Agency (Government). The contract called for Pouch to produce combat rations, known as "Meals, Ready to Eat" (Food Pouches), for use by branches of the Armed Services. The contract gave Pouch the right to progress payments upon request, not more often than bi-weekly. The payments were limited to 90% of Pouch's cost incurred to the date of payment. The so-called title vesting clause of the progress payment part of the contract provided that title to all parts, materials, inventories, work in process and various other categories immediately vested in the Government.[1] Other provisions gave the Government the right to terminate for default (or for convenience of the Government) and to require delivery to it of completed supplies and manufacturing materials. The contract also provided that if, after notice of termination for default, it was determined that Pouch was not in default or that default was excusable, the rights and obligations of the parties would be the same as if the notice of termination had been for convenience of the Government.
 
 
 3
 After making approximately $13 million in progress payments the Government terminated the contract for default. The Government claimed that Pouch had not complied with required production schedules. On November 10, 1980, three days after the contract was terminated, Pouch filed a petition for reorganization under Chapter 11 of the Bankruptcy Code, 11 U.S.C. Sec. 101 et seq. The Government claimed ownership and possession of all the property allocable to the contract in Pouch's possession or stored at warehouse facilities on its behalf. On December 5, 1980 the Government filed an adversary complaint in bankruptcy court to obtain possession.
 
 
 4
 Pouch filed an answer principally alleging wrongful termination of the contract and that the Government's title was a security interest not perfected as required by law and subordinate to the rights of the debtor and creditors. Pouch filed a counterclaim seeking damages arising from wrongful termination of the contract.
 
 
 5
 On February 9, 1981, the bankruptcy court held that, as a matter of law, the Government had absolute title to the property in question and was entitled to repossess it.
 
 
 6
 While the appeals were pending the bankruptcy court held that it had jurisdiction to hear Pouch's counterclaim even though the Armed Services Board of Contract Appeals had concurrent jurisdiction over the claim.
 
 
 7
 After the district court decided that questions of fact must be determined and remanded to the bankruptcy court, the Government filed a motion for reconsideration. In 1983, before that motion was decided, Pouch filed a motion in the district court to withdraw from the bankruptcy court the reference of the Government's adversary proceeding. That motion was granted.
 
 
 8
 Upon reconsideration the district court held that, as a matter of law, the Government had absolute title to all of the property covered by the title vesting clause. In Re American Pouch Foods, Inc., 30 B.R. at 1023. The court also noted that if the Government only took a lien on the allocable property, to secure its progress payments, the lien would be paramount to any other liens. Id. The court decided to abstain from hearing Pouch's counterclaim because the issue was better brought before the Armed Services Board of Contract Appeals. Id. at 1024.
 
 
 9
 * Pouch is a debtor in possession in a reorganization proceeding and as such claims, under 11 U.S.C. Sec. 544(a)(1), the rights and powers of a creditor with a judicial lien. Pouch argues that the title vesting clause in the contract only gave the Government a security interest (lien) in the contract property and that Pouch's hypothetical lien has priority because the Government's lien was not perfected in compliance with the Illinois Commercial Code.
 
 
 10
 Pouch relies on United States v. Kimbell Foods, Inc., 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979). There the Supreme Court was confronted with the issue of "whether contractual liens arising from certain federal loan programs take precedence over private liens, in the absence of a federal statute setting priorities." 440 U.S. at 718, 99 S.Ct. at 1453 (footnote omitted). The loan programs involved were those of the Small Business Administration and Farmers Home Administration. The Court found it clear that priority of liens stemming from federal lending programs must be determined with reference to federal law. 440 U.S. at 726, 99 S.Ct. at 1457. After analysis of the character and purposes of the lending programs, the Court found it prudent in determining priority "to adopt the ready made body of state law as the federal rule of decision until Congress strikes a different accommodation." 440 U.S. at 740, 99 S.Ct. at 1464 (footnote omitted).
 
 
 11
 Pouch first contends that the title vesting clause in the Pouch contract creates only a security interest in the Government such as was clearly the case in Kimbell Foods and secondly that the principles applied in Kimbell Foods require application of the Illinois Commercial Code to determine priority here. It would follow that Pouch's statutory lien as debtor in possession would be superior to the lien of the Government.
 
 
 12
 We first consider whether the Government has title such that there is no question of priority of liens. The clear and precise language of the contract between Pouch and the Government granted the Government title. Pouch argues that, notwithstanding the language of the contract, given the intent of the parties, the many incidents and risks of ownership retained by Pouch under the contract, and modern theory in the law of secured transactions, the title vesting clause should not be interpreted literally as grant of title to the Government.
 
 
 13
 We acknowledge, generally, that contract language which purports to place title to goods in a party not in possession of them may well create only a security interest in that party. See, e.g., Commercial Code provisions, Ill.Rev.Stat. ch. 26, Secs. 1-201(37) (Supp.1985), 9-102 and 9-202 (1974). The terms of this contract left Pouch with many of the incidents and risks of ownership.
 
 
 14
 Thus there would be considerable reason to treat provisions like these, if found in a private contract, as creating a security interest. On the other hand, this is a contract for the procurement of materials for national defense, with its terms spelled out in the regulations of the Defense Department, 32 C.F.R. Sec. 163.79, and a history suggesting a substantial reason for very literal interpretation of the title vesting language.
 
 
 15
 Since 1823 there has been a federal statute prohibiting advances of public money and payment on contracts in excess of the value of service rendered or goods delivered previously to payment. 3 Stat. 723, Rev.Stat. Sec. 3648 (1873), 31 U.S.C. Sec. 529 (1981), 31 U.S.C. Sec. 3324 (1983). Apparently there grew up a concept of purchase of unfinished goods in return for progress payments (often, in earlier years, referred to as "partial payments"), and doctrine that this statute is not violated by payment previous to delivery if title to the portion paid for has vested in the Government at the time of payment, or if the articles are then impressed with a valid lien in favor of the Government.
 
 
 16
 Although the practice has been severely criticized, e.g., McClelland, The Illegality of Progress Payments as a Means of Financing Government Contractors, 33 Notre Dame Law. 380 (1958), the theory had been supported by a 1941 ruling of the Comptroller General, 20 Comp.Gen. 917, 918 (1941), quoted in McClelland, op. cit. p. 389, and by opinions of the Attorney General, cited in Whelan, Government Supply Contracts: Progress Payments Based on Costs; The New Defense Regulations, 26 Fordham Law Rev. 224, 232 (1957).
 
 
 17
 In 1911 a statute expressly authorized the Navy to make progress payments (referred to as partial payments) in return for a lien, paramount to all other liens. 37 Stat. 32, 10 U.S.C. Sec. 7521.
 
 
 18
 The First War Powers Act, 55 Stat. 839, Sec. 201, December 8, 1941, authorized advance and progress payments on war effort contracts.
 
 
 19
 Statutory authority for advance payments (but not progress payments) was conferred by Sec. 5 of the Armed Services Procurement Act of 1947, 62 Stat. 21, February 19, 1948. Section 5(b) required adequate security and provided that the contract may include a lien, paramount to all other liens.[2]
 
 
 20
 In 1952 Defense Contract Financing Regulations were issued. 32 C.F.R. Part 82, 17 Fed.Reg. 3581, April 23, 1952. There were references to progress payments as one method of financing, along with advance payments and guaranteed loans. An earlier form of regulations required the vesting of title when progress (partial) payments were made. City of Detroit v. Murray Corp., 355 U.S. 489, 517-18 n. 4, 78 S.Ct. 458, 465-66 n. 4, 2 L.Ed.2d 441 (1958) (Whittaker, J., dissenting).
 
 
 21
 On December 17, 1956, revised Defense Contract Financing Regulations were issued. 32 C.F.R. Part 82, 22 Fed.Reg. 815, February 9, 1957. Subpart E, devoted to Progress Payments Based on Costs, required a title clause virtually the same as now required for Small Business concerns by 32 C.F.R. Sec. 163.79 and appearing in the Pouch contract under consideration.
 
 
 22
 The provision for advance payments was codified as 10 U.S.C. Sec. 2307 by 70A Stat. 1, P.L. 84-1028. As codified, Sec. 2307(a) authorized advance payments and Sec. 2307(c) required adequate security, which may be a lien paramount to any other liens.
 
 
 23
 Section 2307 was amended in August, 1958, adding express authority to make progress payments, and then, as now, Sec. 2307(a)(1) reads:
 
 
 24
 (a) The head of any agency may--
 
 
 25
 (1) make advance, partial, progress, or other payments under contracts for property or services made by the agency; ....
 
 
 26
 P.L. 85-800 Sec. 9, 72 Stat. 967, August 28, 1958. No reference to progress payments was inserted into (c) so that literally the provision requiring security and making the Government lien paramount applies only to advance payments.
 
 
 27
 The legislative history reported in [1958] U.S.CODE CONG. & AD.NEWS 4021 deals with other considerations, with one exception. It contains a letter from the Comptroller General to the Chairman of the Senate Committee on Government Operations. Among a number of comments, the letter says:
 
 
 28
 We believe that the authority to make "progress" payments should not be provided, unless provision is also made to preserve to the Government the right to take title to or receive a lien paramount to all other liens on the property on which it makes a progress payment.
 
 
 29
 Although Congress inserted no language in response to the suggestion, we can think of no reason why Congress could have intended less protection for the Government when making progress payments than when making advance payments. If the omission of progress payments from Sec. 2307(c) were inadvertent and if the title clause creates only a lien, it would follow that such lien was intended to be paramount. But the 1958 amendment was enacted when the practice of contracting for progress payments in return for title had been followed for many years. Regulations spelling out the practice and the terms of the title clause had been in effect for eighteen months.[3] We conclude that Congress recognized the practice of making progress payments in return for title and in expressly authorizing progress payments intended to validate the practice. Cf. City of Detroit v. Murray Corp., 355 U.S. at 517-18 n. 4, 78 S.Ct. at 465-66 n. 4 (Whittaker, J., dissenting).
 
 
 30
 Strong support for literal interpretation of the title clause as vesting ownership in the Government is found in United States v. Ansonia Brass & Co., 218 U.S. 452, 31 S.Ct. 49, 54 L.Ed. 1107 (1910). The decision may not be conclusive, for the property there involved was a dredge, far more identifiable at any stage before completion than the materials and pouches involved here, and the contracts are not identical. The Supreme Court there said, however,
 
 
 31
 It is undoubtedly true that the mere facts that the vessel is to be paid for in installments as the work progresses, and to be built under the superintendence of a government inspector, who had power to reject or approve the materials, will not of themselves work the transfer of the title of a vessel to be constructed, in advance of its completion. But it is equally well settled that if the contract is such as to clearly express the intention of the parties that the builder shall sell and the purchaser shall buy the ship before its completion, and at the different stages of its progress, and this purpose is expressed in the words of the contract, it is binding and effectual in law to pass the title.
 
 
 32
 218 U.S. at 466-67, 31 S.Ct. at 52-53 (citation omitted).
 
 
 33
 There are a number of other decisions recognizing, or at least consistent with, Government ownership of goods in the possession of others, by virtue of the title vesting clause. City of Detroit v. Murray Corp., 355 U.S. 489, 78 S.Ct. 458, 2 L.Ed.2d 441 (the majority upheld a local tax on use or possession of property, assuming the property was owned by the Government; the minority concluded that the Government owned the property by virtue of the title vesting clause and considered the tax invalid, 355 U.S. at 514-24, 78 S.Ct. at 463-69); U.S. v. Allegheny County, 322 U.S. 174, 183, 64 S.Ct. 908, 913, 88 L.Ed. 1209 (1944); United States v. Digital Products Corp., 624 F.2d 690 (5th Cir.1980); In re Double H Products Corporation, 462 F.2d 52 (3rd Cir.1972); Boeing Company v. United States, 338 F.2d 342, 168 Ct.Cl. 109 (1964); Shepard Engineering Company v. United States, 287 F.2d 737, 741 (8th Cir.), reh'g denied 289 F.2d 681 (8th Cir.1961) (per curiam ); In re American Boiler Works, 220 F.2d 319 (3rd Cir.1955); In re Read-York, 152 F.2d 313 (7th Cir.1945); United States v. Buder, 414 F.Supp. 1 (E.D.Mo.1975), aff'd without opinion, 538 F.2d 333 (8th Cir.1976); United States v. Ameco Electronic Corporation, 224 F.Supp. 783 (E.D.N.Y.1963); In re Pamlico Canvas Products, Inc., No. 82-01464-4 (Bankr., E.D.N.C., May 19, 1983); In re Invader Corporation, United States v. Invader Corporation, No. 1-81-00338E (Bankr.W.D.Tex., Jan. 12, 1983); United States v. Metadine Corporation, No. C080 0460 (E.D.N.Y., Apr. 17, 1980).
 
 
 34
 In In re Murdock Mach. & Eng. Co. of Utah, 620 F.2d 767 (10th Cir.1980), the court appeared to acknowledge that the title clause made the Government a good faith purchaser for value of goods purchased by the contractor. The seller of the goods, however, had learned of the insolvency of the contractor and had stopped the goods in transit to the contractor. The court applied the U.C.C., according to the seller the right to stop in transit, superior to the Government's right as good faith purchaser. The decision is consistent with recognition of the Government's title in our present case, unaffected by the debtor's statutory lien.
 
 
 35
 In Marine Midland Bank v. United States, 687 F.2d 395, 231 Ct.Cl. 496 (1982), the court read the title vesting clause as creating security for repayment (out of amounts due the contractor at final performance) of the progress payments, which the court deemed loans, rather than partial purchases. Having decided that the Government had only a security interest (as Pouch contends here) the court declined to apply the state U.C.C. as the federal rule of decision governing priority. Emphasizing the need for standardization and uniformity in Government procurement, as distinguished from the federal loan programs which were the subject of Kimbell Foods, supra, the court chose a rule that "the government's security interest under its title vesting procedures [is] paramount to the liens of general creditors." Id. 687 F.2d at 404. We would agree with the latter holding if the Government's interest were only a lien.
 
 
 36
 We acknowledge the reasonableness of the Marine Midland view if we were considering the title vesting provisions on a clean slate. We do not agree, however, that because the 1958 enactment of express authority to make progress payments removed the original motive for using a title vesting clause, the construction of the clause should change at the time of that enactment. See 687 F.2d at 401. Notwithstanding Judge Bennett's meticulous explication, we see no reason for departure from the consistent holdings before and after 1958 that the title vesting clause is to be taken literally.
 
 
 37
 We note, however, that application of the Marine Midland rule to the present case would produce the same result we reach, awarding possession to the Government. Pouch does not argue, nor does the record suggest, that the value of the goods exceeds the total of progress payments. Cf. 687 F.2d at 405.
 
 
 38
 In United States v. Lennox Metal Manufacturing Co., 225 F.2d 302 (2nd Cir.1955) the court considered a contract providing for progress payments (there called partial payments) and containing a title vesting clause. The Government terminated the contract for default and sued the contractor to recover possession of the property and damages. The district court had found with adequate support that the contractor was not in default, and that foreclosed recovery of damages. The district court also denied recovery of possession.
 
 
 39
 Judge Frank wrote the opinion, stating his individual view in Part I. Part II, 225 F.2d beginning at 317, was agreed to by all three judges. The Government contended that upon failure to prove default by the contractor, it had nevertheless brought about a termination for convenience. The contract so provided. The court affirmed the denial of possession, holding in Part II that the Government's refusal to make larger progress payments had been inequitable and such conduct had disentitled it to equitable relief, i.e., "the enforcement of an equitable lien on the [contractor's] property." 225 F.2d at 317. Evidently, although without explanation, the court interpreted the title vesting clause as creating only an equitable lien.
 
 
 40
 We do not agree. Our interpretation of the contract is that upon termination, whether for default or convenience, the Government becomes entitled to possession of the property to which it has title. The ultimate rights to pecuniary adjustment between the parties will depend upon the type of termination, but the Government is entitled to possession under either type. The Fifth Circuit has held that:
 
 
 41
 [I]n cases involving termination of Government contracts, where the product is part of the national defense effort, the jurisdiction of the district courts does not embrace any issue beyond that of title, so long as the Government represents in its complaint that the contract had been terminated. To hold otherwise would permit a contractor to plead and litigate factual issues surrounding the termination, and delay delivery of vitally-needed defense products.
 
 
 42
 United States v. Digital Products Corp., 624 F.2d 690, 692 (5th Cir.1980); accord In Re Greenstreet, Inc., 209 F.2d 660, 667 (7th Cir.1954).
 
 
 43
 Lennox has not been followed, and has been criticized.[4] Even if a court would apply equitable principles against the Government in a case where extreme unfairness were shown, circumstances of that type have not been suggested here.
 
 II
 
 44
 Pouch filed a counterclaim seeking money damages, alleging that the termination was without just cause, and thus was for the convenience of the Government. The Government asserts sovereign immunity. We need not reach the issue of immunity.
 
 
 45
 The district court decided to abstain from hearing the counterclaim, concluding that because the Armed Services Board of Contract Appeals and the Court of Claims have expertise in the specialized area of law involved, it would be in the interest of justice for the district court to abstain.
 
 
 46
 Pouch does not seek review of the abstention decision on its merits, but contends that a particular statute deprived the district court of power to decide to abstain.
 
 
 47
 Pouch relies upon 28 U.S.C. Sec. 1471(d) created by P.L. 95-598 Sec. 241(a), November 6, 1978, 92 Stat. 2668, made applicable to former courts of bankruptcy during the transition period by Sec. 405(b). Section 405(b) was repealed by P.L. 98-353, Sec. 114, 98 Stat. 343, July 10, 1984. Section 113 deprived Sec. 241(a) of all other effect.
 
 Section 1471(d) provided:
 
 48
 Subsection (b) or (c) of this section does not prevent a district court or a bankruptcy court, in the interest of justice, from abstaining from hearing a particular proceeding arising under title 11. Such abstention, or a decision not to abstain, is not reviewable by appeal or otherwise.
 
 
 49
 Pouch does not argue that its counterclaim was not "a particular proceeding" subject to possible abstention. Rather, Pouch relies on the June 5, 1981 decision of a bankruptcy judge denying the Government's motion to dismiss the counterclaim for lack of jurisdiction and requiring the Government to answer. Pouch interprets this order as a decision not to abstain, and reasons that the district court decision to abstain, June 20, 1983, was a forbidden review of the June 5, 1981 decision of the bankruptcy judge.
 
 
 50
 The February 1981 decision of the bankruptcy judge that the Government was entitled to possession came before the district court on appeal. It is not clear whether there was also an appeal from the June 1981 decision of the bankruptcy judge, but as the law then stood, only an appeal could have brought it before the district court. In the posture of appeal, Pouch might well be correct in its contention that the district court could not review the June 1981 decision insofar as it was a decision not to abstain. Other very significant developments intervened.
 
 
 51
 The first was the 1982 Supreme Court decision that the broad grant of jurisdiction in Sec. 1471 was unconstitutional. Northern Pipeline Construction Co. v. Marathon Pipeline Co., 458 U.S. 50, 87, 102 S.Ct. 2858, 2880, 73 L.Ed.2d 598 (1982). The Court stayed its judgment until October 4, 1982, in order to give Congress an opportunity to reconstitute the bankruptcy courts or to adopt other valid means of adjudication. The stay was extended until December 24, 1982. 459 U.S. 813, 103 S.Ct. 199, 74 L.Ed.2d 160 (1982).
 
 
 52
 In these circumstances, the Judicial Councils of the Circuits directed the district courts to adopt rules to govern bankruptcy cases.
 
 
 53
 The Emergency Rule adopted by the District Court for the Northern District of Illinois, effective December 25, 1982, provided for the automatic referral of all cases arising under Title 11 and all civil proceedings arising in or related to Title 11 to the bankruptcy judges. (Emergency Rule Section (c)(1).) The Rule also stated that:
 
 
 54
 [t]he reference to a bankruptcy judge may be withdrawn by the district court at any time on its motion or on timely motion by a party.... If a reference is withdrawn the district court may retain the entire matter, may refer part of the matter back to the bankruptcy judge, or may refer the entire matter back to the bankruptcy judge.
 
 
 55
 Rule (c)(2).
 
 
 56
 In early 1983 the district court had before it the Government's motion to reconsider the decision on appeal from the February 1981 decision of the bankruptcy judge. Pouch, however, moved to have the reference to the bankruptcy judge withdrawn. The motion was granted February 17, 1983.
 
 
 57
 The Government argues that the withdrawal of the reference was a recapture by the district court of original jurisdiction and that further proceedings in district court were de novo and not on appeal.
 
 This court has stated that:
 
 58
 The Interim Rule adopted by the district courts establishes a system of bankruptcy adjudication whereby the bankruptcy judges act as adjuncts of the Article III district courts. The district courts retain primary jurisdiction over bankruptcy matters while the bankruptcy judges have only derivative and terminable jurisdiction. The bankruptcy judges act as subsidiaries to and only in aid of the district courts by carrying on preliminary procedures and proposing decisions for adoption by the district court. The ultimate adjudicatory determination is reserved to the district judge.
 
 
 59
 In Re Mark Stewart, 741 F.2d 127, 131 (7th Cir.1984) (emphasis added and citations omitted). We think that in these circumstances reconsideration by the district court did not constitute review of the earlier decision on abstaining. The situation was the same as if the district court had itself made the earlier decision. See United States v. Birney, 686 F.2d 102, 107 (2nd Cir.1982) (judges of coordinate jurisdiction are not bound by other judges' rulings on the same facts; they are free to disregard the decisions if sufficient notice and an opportunity to prepare are given to concerned parties); Champaign-Urbana News, Etc. v. J.L. Cummins, 632 F.2d 680, 683 (7th Cir.1980) (as modified on denial of rehearing and rehearing en banc ) (a second judge, upon the first judge obtaining senior status, is not precluded by the "law of the case" doctrine from coming to a different conclusion from that of the first judge on the same facts).
 
 
 60
 Pouch apparently reasons that Sec. 1471(d) prohibits us from reviewing the merits of the district court's decision to abstain, but that we could properly vacate that decision if Sec. 1471(d) prohibited the district court from making it. Assuming we have that power we conclude that the district court was free to reconsider the matter of abstention without engaging in forbidden review.
 
 
 61
 We have already noted that on July 10, 1984, Sec. 1471(d) ceased to have any effect. At that date this appeal had been taken, but was not yet argued. On July 10, 1984 Sec. 101(a) of P.L. 98-353 added subsection (c) to 28 U.S.C. Sec. 1334. Subsections (c)(1) and (2) contain provisions similar to Sec. 1471 with respect to abstention. The prohibition of review is in (c)(2). Section 122(b) of P.L. 98-353, however, provides that (c)(2) shall not apply with respect to cases pending on July 10, 1984.
 
 
 62
 Assuming that we presently have jurisdiction to review the district court decision to abstain, we find no abuse of direction.
 
 
 63
 The judgment appealed from is AFFIRMED.
 
 
 64
 SWYGERT, Senior Circuit Judge, dissenting.
 
 
 65
 Because this case concerns the rights of the United States arising under a nationwide federal program, there is no question that federal law governs. United States v. Kimbell Foods, Inc., 440 U.S. 715, 726-27, 99 S.Ct. 1448, 1457-58, 59 L.Ed.2d 711 (1979). Yet, in defining the rule of decision that gives content to that federal common law, this court must often resort to State law, particularly where there is no express congressional directive to the contrary and where any other rule would disrupt commercial relations predicated on State law. See id. at 728-29, 740, 99 S.Ct. at 1458-59, 1464. I would apply Illinois' Uniform Commercial Code as the rule of decision and would hold that the United States owned only an unperfected security interest in the seized assets.
 
 
 66
 In Kimbell, 440 U.S. at 728-29, 740, 99 S.Ct. at 1458-59, 1464, the Supreme Court held that State law should apply as the rule of decision in a commercial dispute involving a nationwide federal program if (1) there is no congressional directive to the contrary, (2) the federal program in question need not be uniform in character nationwide, (3) the application of State law would not frustrate specific objectives of the program, and (4) the application of a federal rule would disrupt commercial relationships predicated on State law. The majority holds, under two alternative theories, that the first criterion was not satisfied in the case at bar.
 
 
 67
 First, the majority holds that by passing legislation in 1958 expressly authorizing "progress payments," see 10 U.S.C. Sec. 2307(a)(1) (1982), Congress necessarily incorporated as binding federal law the past practices that defined the term. Because the United States had always purported to take absolute title--rather than a security interest--in the parts, work in process, and inventories of government contractors in return for progress payments, Congress must have intended to incorporate this practice into the law. See ante at 1193-1196.
 
 
 68
 Yet, as the majority's thorough historical review demonstrates, ante at 1193-1194, the 1958 statute simply marked the culmination of Congress' long retreat from its former prohibition of advances of public money to government contractors in excess of the value of services already rendered or goods already delivered. It was Congress' intent to legalize the practice of advance payments in general. The statute and legislative history are silent on the question of whether the title-vesting clause that traditionally accompanied progress payments should be interpreted literally or as a de facto security interest. The only relevant concern of Congress was that the federal government be permitted to pay money in advance of contract performance; the specifics of defining the effect and ramifications of various contractual alternatives, such as progress payments, were left open.[1]
 
 
 69
 Congressional silence on such issues should not be interpreted as an invitation to the courts to fashion a uniform federal common law. The "guiding principle" in deciding whether to fashion rules of federal common law or to incorporate State law is that a "significant conflict between some federal policy or interest and the use of state law in the premises must first be specifically shown." Wallis v. Pan American Petroleum Corp., 384 U.S. 63, 68, 86 S.Ct. 1301, 1304, 16 L.Ed.2d 369 (1966). It is not enough that Congress could have readily enacted a complete code of law governing these commercial transactions better than the available State law; the "latent federal power ... to displace state law is primarily a decision for Congress," and Congress must explicitly indicate its intent to exercise this power. See id.
 
 
 70
 The second theory advanced by the majority, see ante at 1196, is that assuming the Government's interest should be defined as a security interest, pursuant to well-established principles of State commercial law, Congress has already provided by statute the governing law of priority. In authorizing liens to secure "advance" payments, Congress required that such liens be "paramount to any other lien." 10 U.S.C. Sec. 2307(c) (1982). Despite the historical differences between "advance" and "progress" payments, Congress must have used the term "advance payments" in the generic sense to include all kinds of payments in advance of full contract performance. "[W]e can think of no reason why Congress could have intended less protection for the Government when making progress payments than when making advance payments." Ante at 1194.
 
 
 71
 I agree. Because Congress has expressly provided that government liens be paramount, this directive must be incorporated as a rule of priority. But one rule of priority does not make a commercial code. Congress provided no direction on a myriad of issues that must be decided in this case and in other commercial cases. There are no guidelines as to how to judge the validity of a government lien, when it attaches, or what prerequisites--such as perfection--must be met before a particular government lien can be enforced as a paramount lien. I would hold that State law provides the rule of decision in determining the creation, validity, and perfection of government liens.
 
 
 72
 It is not incongruous to hold that different sources of law govern various, but related, aspects of a single commercial transaction. Kimbell does not require that a commercial transaction be governed entirely by federal common law or entirely by State law. Indeed, the Supreme Court has stressed that "[e]ven where there is related federal legislation in an area ... it must be remembered that 'Congress acts ... against the background of the total corpus juris of the states.' " Wallis, 384 U.S. at 68, 86 S.Ct. at 1304 (quoting Hart & Wechsler, The Federal Courts and the Federal System 435 (1953)). In Wallis the Court adopted the kind of hybrid law I propose in the case at bar. The Court held that while federal law governs the ability of private parties to assign oil and gas leases, State law governs the validity of a particular transfer between two parties. Similarly, this court in United States v. Meadors, 753 F.2d 590, 592 (7th Cir.1985), selectively applied State law to only a few of the specific issues of commercial law presented in that case. Such hybrid law is consistent with our conception of federal regulation as often "interstitial in nature, enacted against a background of state law and building on state law relationships." Comment, Adopting State Law as the Federal Rule of Decision: A Proposed Test, 43 U.Chi.L.Rev., 823, 829 (1976); accord Mishkin, The Variousness of "Federal Law": Competence and Discretion in the Choice of National and State Rules for Decision, 105 U.Penn.L.Rev. 797, 804-05 (1957) ("Most pervasive, perhaps, is the principle that a decision to apply state law as a matter of federal judicial incorporation may frequently be made as to a single issue at a time.").
 
 
 73
 The first prong of Kimbell is therefore satisfied: there has been no congressional directive regarding what law should govern the creation, validity, and perfection of a government lien. Turning to the second prong, I would follow the Tenth Circuit's holding that the government's interest in a uniform federal law for military procurement would not be compromised by the incorporation of the Uniform Commercial Code ("UCC") as the rule of decision. In re Murdock Machine & Engineering Co. of Utah, 620 F.2d 767, 772-73 (10th Cir.1980). The need for uniformity is already satisfied by State law itself, inasmuch as every State except Louisiana has enacted the UCC. See J. White & R. Summers, Handbook of the Law Under the Uniform Commercial Code Sec. 1 at 1 & n. 1 (2d ed. 1980). Here, as in Kimbell, 440 U.S. at 732-33 & n. 28, 99 S.Ct. at 1460-61 & n. 28, there is no evidence that the "minor variations" in Article 9 of the UCC from State to State would hinder the government's national program. That the government program here involves national defense does not alter this conclusion. I fail to see how the trivial inconveniences attending compliance with the essentially uniform recording requirements of the States somehow threaten national security. Accord Murdock, 620 F.2d at 772-73.
 
 
 74
 As for the third prong of Kimbell, it can be argued that destroying the priority of federal liens by subjecting the federal government to State recording requirements would frustrate a specific objective of the federal procurement effort: to ensure that federal liens are paramount to all others. It is true that incorporating State law as the rule of decision in the case at bar may effectively destroy the value of the Government's claim to the seized assets. Yet, if noncompliance with State recording laws would effectively defeat the Federal government's ability to claim a paramount lien, certainly compliance would not.[2] The Government's assertion at oral argument that incorporating the UCC into federal law would destroy the value of billions of dollars of government liens is an argument against retroactive application of such a rule, not an argument that the government would be unable to protect its interests under the UCC in the future.
 
 
 75
 There is no question that the fourth prong of Kimbell is satisfied. The application of a federal rule would disrupt commercial relationships predicated on State law. With an annual budget that will soon exceed $300 billion, see Boyd, Leaders Report Budget Accord with President, N.Y. Times, July 10, 1985, at 11, col. 5, the Defense Department has an enormous, brooding presence in the marketplace. Yet, it is not always obvious that the military is involved in a particular transaction. There is nothing inherent in the purchase of such pedestrian goods as food in the case at bar or steel in Murdock that alerts the seller to the military's presence. Thus, allowing the military to hold enormous secret liens wreaks havoc with the expectations of the business community. "Mindful of the burdens of time and expense such investigations [of the possibility of the military's interest in a transaction] would impose on our nation's commerce, and the injustice which would result by dealing government 'wild cards' to businessmen at random," I am "not inclined to create a special commercial law for the government's benefit." Murdock, 620 F.2d at 772.
 
 
 76
 I would therefore hold that State law provides the rule of decision governing the creation and perfection of the Government's security interest. As the majority apparently agrees, see ante at 1193, there can be little doubt that the title-vesting clause created a security interest. Illinois' UCC defines a secured transaction to include "any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures." Ill.Ann.Stat. ch. 26, Sec. 9-102(1)(a) (Smith-Hurd 1974) ("Ill. UCC"). Thus, the Government's characterization of its interest as one of absolute title is irrelevant; it is the intent of the parties, not the form of the transaction, that is dispositive.[3] Here, the many incidents of ownership conferred on Pouch[4] combined with the federal contract officer's testimony that the purpose of the title-vesting clause was to secure performance, see Appellant's Brief at 26-27 (quoting Transcript), compel the conclusion that the parties intend the Government to take only a security interest.
 
 
 77
 It is undisputed that the Government failed to file a financing statement pursuant to Ill. UCC Secs. 9-103, 9-302, 9-401-03. The Government therefore held only an unperfected security interest in the seized assets. Id. at Sec. 9-303. To be sure, this did not render the security agreement invalid or unenforceable. And it can be argued that as long as the Government's security interest is valid under State law, the federal rule of priority should apply to render the Government's lien paramount. Yet, the federal statute is so sparse as to what prerequisites should be met to create a valid and enforceable paramount lien that I would define the State perfection requirement as such a prerequisite. Only in this way can federal legislation that is interstitial in nature be brought into harmony with the broad body of State law that remains in force and effect until expressly replaced with more comprehensive federal legislation. See supra at 1200.
 
 
 78
 I would hold then, that before the Government seized Pouch's assets, it held an unperfected security interest. As such, its rights were subordinate to those of a variety of other creditors, including the debtor-in-possession. See Ill. UCC Secs. 9-301(1), (3).[5]
 
 
 79
 It should be noted, however, that once the Government came into possession of the collateral, no creditor, regardless of its superior claim of right, could compel repossession. Such repossession would be inconsistent with the sovereignty of the United States. Rather, the remedy for those who held superior claims to the collateral is to sue for their proper share of the proceeds, because in destroying the value of their claims, the Government took their property without just compensation. See U.S. Const. amend. V; Armstrong v. United States, 364 U.S. 40, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960); United States v. Ansonia Brass & Copper Co., 218 U.S. 452, 471, 31 S.Ct. 49, 54, 54 L.Ed. 1107 (1910); Marine Midland Bank v. United States, 687 F.2d 395, 397-98, 231 Ct.Cl. 496 (1982), cert. denied, 460 U.S. 1037, 103 S.Ct. 1427, 75 L.Ed.2d 788 (1983).
 
 
 80
 I would therefore reverse and remand for further proceedings.
 
 
 
 [1]
 The title vesting clause in the contract provided, in pertinent part:
 (d) Title. Immediately, upon the date of this contract, title to all parts; materials; inventories; work in progress; ... theretofore acquired or produced by the Contractor and allocable or properly chargeable to this contract under sound and generally accepted accounting principles and shall forthwith vest in the Government; and title to all like property thereafter acquired or produced by the Contractor and allocable or properly chargeable to this contract as aforesaid shall forthwith vest in the Government upon said acquisition, production or allocation. Notwithstanding that title to property is in the Government through the operation of this clause, the handling and disposition of such property shall be determined by applicable provisions of this contract such as: the Default clause and paragraph (h) of this clause; Termination for Convenience of the Government clause; and the Special Tooling clause....
 
 
 [2]
 Similar provisions in procurement for agencies other than Armed Services appeared in the Federal Property and Administrative Services Act of 1949, 63 Stat. 377, June 30, 1949
 
 
 [3]
 There had been an earlier version as well. City of Detroit v. Murray Corp., 355 U.S. 489, 517-18 n. 4, 78 S.Ct. 458, 465-66 n. 4, 2 L.Ed.2d 441 (1958) (Whittaker, J., dissenting)
 
 
 [4]
 See, Pasley, The Interpretation of Government Contracts: A Plea for Better Understanding, 25 Fordham L.Rev. 211, 230-40 (1956); Whelan, Government Supply Contracts: Progress Payments Based on Costs; The New Defense Regulations, 26 Fordham L.Rev. 224, 241-42 (1957). See also Bachman, Defense Department Contract Financing, 25 Geo.Wash.L.Rev., 228, 234 (1957)
 
 
 [1]
 Thus, in explaining its legalization of advance payments, the Senate Report simply cited the need for a "modernized code of procurement procedures." S.Rep. No. 2201, 85th Cong., 2d Sess., reprinted in 1958 U.S.Code Cong. & Ad.News 4021, 4024. Congress approved the principle of advance payments as consistent with modern commercial practice, but left to others the task of defining the specific rules governing advance payments
 
 
 [2]
 I would therefore hold that if the government executes a proper security agreement and if its lien attaches and is perfected, then the government holds a paramount lien--superior in priority even to the perfected security interests of other creditors
 
 
 [3]
 To be sure, the Supreme Court in United States v. Ansonia Brass & Copper Co., 218 U.S. 452, 466-67, 31 S.Ct. 49, 52-53, 54 L.Ed. 1107 (1910), interpreted the title-vesting clause literally. Yet, this holding simply provided a rule of federal common law. Because Kimbell, properly applied, requires the court to rely on State law in the case at bar, the Ansonia Brass rule is irrelevant
 
 
 [4]
 For example, the contract provided that Pouch (1) retain possession of the contract property with full authority to process it, (2) bear the risk of loss, (3) sell any production scrap, and (4) gain title to property obtained from suppliers as soon as all progress payments were repaid or as soon as the contract deliveries were made. Curiously enough, the contract also required Pouch to convey title to the Government if the contract was terminated "for cause" or "for convenience." See Appellant's Supplemental Appendix at 63a (reprinting contract)
 
 
 [5]
 On the other hand, the creditors that the debtor-in-possession represents in addition to the Government may not enjoy a superior claim to the seized assets. Even an unperfected security interest has priority over the interest of an unsecured creditor, although there are some exceptions. See Ill. UCC Sec. 9-301. As for secured creditors, the Government points out that Pouch's two major lenders had executed agreements subordinating their claims to those of the Government. Appellee's Brief at 5. Thus, it is quite likely that even under my proposed disposition of the case, the Government would ultimately prevail, though certainly a remand would be necessary to determine whether this is correct