In re **MURDOCK MACHINE AND ENGINEERING CO. OF UTAH, Bankrupt.**

**RAMCO STEEL, INC., Plaintiff-Appellee,**

v.

**Lindsey KESLER, Trustee, Defendant-Appellee,**

**and**

**United States of America, Defendant-Appellant.**

**No. 78–1547.**

United States Court of Appeals, Tenth Circuit.

Argued March 10, 1980.

Decided May 1, 1980.

Glen E. Clark of Fabian & Clendenin, Salt Lake City, Utah, for plaintiff-appellee.

Krege B. Christensen and David S. Dolowitz of Parsons, Behle & Latimer, Salt Lake City, Utah, for defendant-appellee.

Sara Sun Beale, Asst. Sol. Gen., Dept. of Justice, Washington, D. C. (Barbara Allen Babcock, Asst. Atty. Gen., Washington, D. C., Ronald L. Rencher, U. S. Atty., Salt Lake City, Utah and William G. Kanter, Atty., App. Staff, Civil Division, Dept. of Justice, Washington, D. C., with her on brief), for defendant-appellant.

Before SETH, Chief Judge, McWILLIAMS and BARRETT, Circuit Judges.

BARRETT, Circuit Judge.

The United States appeals from a judgment of the District Court, which affirmed the judgment of the Bankruptcy Court. The Bankruptcy Court dismissed the government's counterclaim for possession of certain cold drawn bar steel and awarded possession of the steel to appellee Ramco Steel, Inc. (Ramco).

*Factual and Procedural Background*

Ramco sold the steel on credit to Murdock Machine and Engineering Company of Utah (Murdock), delivery F.O.B. Buffalo, New York, the place of shipment. The steel was shipped to a warehouse in Indiana for reshipment to Murdock at Clearfield, Utah, the final destination.

The last shipment of steel left Ramco's plant on May 22, 1975. The Bankruptcy Court made no findings about the dates on which other shipments occurred. Murdock had become insolvent on May 13, 1975. Ramco learned of this fact on May 23, 1975. On that same day, Ramco stopped delivery of that steel which was then being held at the Indiana warehouse. In addition, Ramco stopped delivery of one truckload of steel on June 11, 1975.

Unknown to Ramco, Murdock had ordered the steel to fulfill a contractual obligation to the United States to supply fins

and nozzles for missiles. The contract between Murdock and the United States contained a title-vesting clause reading as follows:

> *Title.* Immediately upon the date of this contract, title to all parts; materials; . . . acquired or produced by the contractor [Murdock] and allocated or properly chargeable to this contract under sound and generally accepted accounting principles and practices shall forthwith vest in the Government; and title to all like property thereafter acquired or produced by the contractor and properly chargeable to this contract as aforesaid, shall forthwith vest in the Government upon said acquisition, production, or allocation.

After Murdock filed its petition to be adjudged a bankrupt, Ramco filed a complaint with the Bankruptcy Court seeking reclamation of the steel it had shipped to Murdock on credit. Ramco joined both the trustee in bankruptcy and the United States as defendants. The United States filed a counterclaim, asserting its ownership of the steel by virtue of the contract it had entered into with Murdock.

The Bankruptcy Court conducted a hearing on the conflicting claims of Ramco and the United States. The Bankruptcy Court ruled that Ramco was entitled to reclaim the steel based upon the "applicable law [of] . . . the Uniform Commercial Code" whereby Ramco had exercised its right to stop delivery in transit of the steel following its discovery of Murdock's insolvency. (R., Vol. II, p. 69). The Bankruptcy Court concluded that "the provisions of the contract between the United States of America and the bankrupt are not binding upon the plaintiff [Ramco]." (R., Vol. II, p. 70). The District Court affirmed the judgment of the Bankruptcy Court in all respects.

The government has informed us that, "Pursuant to the agreement of all parties, the steel (which was deteriorating in the warehouse) has been sold, and it is the proceeds from this sale which are at issue here." (Brief of appellant, p. 5, n. 6).

## Contentions on Appeal

On appeal, the United States contends that the District Court erred, in that: (1) Ramco's right (as seller) to stop delivery of the steel in transit under state law is subject to the superior right of the United States to the steel inasmuch as title to the steel passed to the United States, pursuant to its contract with Murdock, immediately after Murdock "acquired" title to the steel, and (2) Ramco's right to stop delivery of the steel in transit pursuant to § 2–705 of the Uniform Commercial Code was not effective against the United States, because the United States was a bona fide purchaser of the steel for value.

## Discussion and Disposition

### I.

The United States contends that Ramco's right to stop delivery of the steel in transit under state law is subject to the superior right of the United States to the steel because title to the steel vested in the United States, pursuant to its contract with Murdock, immediately after Murdock "acquired" the steel.

The United States, of course, relies upon the "title-vesting clause", heretofore quoted verbatim, in advancing its contention that it obtained title to the steel immediately after Murdock acquired *title* to it at the point of shipment, inasmuch as under U.C.C. § 2–401(2) the effect of the delivery term between Ramco and Murdock, *i. e.,* F.O.B. Buffalo, New York, the place of shipment, was to pass title to the steel from Ramco to Murdock at the time and place of shipment. Ramco, however, reasons that because Murdock did not acquire *possession* of the steel, the United States did not obtain title to it.

The Bankruptcy Court made no finding relative to the contract term "acquired". However, for purposes of this opinion only, we will assume that the interpretation urged by the United States is correct.

"The validity and construction of contracts through which the United States is exercising its constitutional functions, their

consequences on the rights and obligations of the parties, the titles or liens which they create or permit, all present questions of federal law not controlled by the law of any state." *United States v. Allegheny County*, 322 U.S. 174, 183, 64 S.Ct. 908, 913–914, 88 L.Ed.2d 1209 (1944), *overruled in part* by *United States v. City of Detroit*, 355 U.S. 466, 78 S.Ct. 474, 2 L.Ed.2d 424 (1958), and companion cases. "In [the] absence of an applicable Act of Congress it is for the federal courts to fashion the governing rule of law according to their own standards." *Clearfield Trust Co. v. United States*, 318 U.S. 363, 367, 63 S.Ct. 573, 575, 87 L.Ed. 838 (1943); *accord, United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 726, 99 S.Ct. 1448, 1457, 59 L.Ed.2d 711 (1979). The government asserts that the United States must be awarded the proceeds of the sale of steel to which it had legally obtained title. The government urges us not to follow the Uniform Commercial Code.

■ The government's argument is tied to the principle that no creditor "may obtain a lien, without the consent of the United States, against any public work . . . to which the United States has taken title". (Brief of appellant, pp. 5–6). *See: United States v. Ansonia Brass & Copper Co.*, 218 U.S. 452, 31 S.Ct. 49, 54 L.Ed. 1107 (1910); *Armstrong v. United States*, 364 U.S. 40, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960). The critical inquiry which the government ignores is *when* Ramco obtained its "lien". Ramco's right to withhold possession of the steel attached when Murdock became insolvent. (U.C.C. § 2–702(1)). Title to the steel did not vest in the government until immediately after it was shipped from Buffalo, New York.

### (a).

As to steel not yet shipped when Murdock became insolvent, Ramco's right was prior in time to the government's. Ramco is entitled to the proceeds of that steel if the analysis of *Armstrong v. United States, supra*, is applied. In *Armstrong v. United States, supra*, the Court held that state-created materialmen's liens which attached to, but had not been enforced against, a privately owned vessel under construction for the government, remained valid after title to the vessel vested in the government under its contract with the shipbuilder.

The *Armstrong* court relied on its earlier holding in *United States v. Alabama*, 313 U.S. 274, 61 S.Ct. 1011, 85 L.Ed. 1327 (1941), that a state tax lien on real property, though inchoate, remained valid as against the United States, which later took title to the property. In *United States v. Alabama, supra*, the Court reaffirmed the principle that lands owned by the United States cannot be taxed by a state. That principle, however, was held not to apply to the prior state tax liens:

> Our present inquiry is whether, assuming the validity of the state statute creating a lien as of October 1, 1936, as against subsequent purchasers, it should be deemed invalid as against the United States. The question is not whether such a lien could be enforced against the United States. The fact that the United States had taken title and that proceedings could not be taken against the United States without its consent would protect it against such enforcement. But that immunity would not be predicated upon the invalidity of the lien. . . .
> . . . [W]e *perceive no reason why the United States, albeit protected with respect to proceedings against it without its consent, should stand, so far as the existence of the liens is concerned, in any different position from that of other purchasers of lands in Alabama who take conveyances on and after the specified tax date.* It is familiar practice for grantees who take title in such circumstances to see that provision is made for the payment of taxes and the Government could easily have protected itself in like manner. . . .
>
> 313 U.S. at pp. 281, 282, 61 S.Ct. at p. 1014. [Emphasis supplied.]

In *Armstrong* the Court flatly rejected the argument that the government's contract with the shipbuilder affected the validity of the materialmen's liens:

The Government also seems to suggest that because the contract between Rice and the United States expressly gave the Government the option of requiring a conveyance of title upon default, petitioners' liens attached subject to that limitation. Petitioners, however, were not parties to the contract. Furthermore, their liens attached by operation of law and nothing in the record indicates that the scope of such liens is affected by contractual arrangements into which the owner of the property may have entered. 364 U.S. at pp. 45–46, 80 S.Ct. at 1567.

In *Armstrong v. United States, supra,* because the United States already had possession of the vessel, the doctrine of sovereign immunity prevented the materialmen from enforcing their liens. Thus, while the liens were legally valid, in fact the United States' immunity from suit rendered the liens inoperative. The Court held that the United States had destroyed the liens and must compensate the materialmen for their value.

The *Armstrong* court distinguished its decision in *United States v. Ansonia Brass & Copper Co., supra.* The Court pointed out that the holding in *Ansonia Brass* went to the issue of enforceability of state-created liens against public works of the United States, and that *Ansonia Brass* did not speak to the issue of the validity of those liens as property rights. *Armstrong v. United States, supra,* 364 U.S. at 47, 80 S.Ct. at 1568.

In our view, the holding in *Ansonia Brass* furnishes no support for the government in this case. Ramco did not attempt to reclaim the steel from the government. Both Ramco and the government sued Murdock's trustee for possession of the steel. Possession of a public work does not now figure in this case, if indeed it ever did. The steel was sold. The dispute now involves entitlement to the proceeds.

■ We believe that *Armstrong* squarely supports Ramco's claim to at least that steel in which Ramco's state created right in the nature of a lien attached before the United States obtained title. As we have noted,

any steel which had not been shipped when Murdock became insolvent belongs in that category. Ramco's right to refuse delivery and to stop delivery of that steel attached when Murdock became insolvent and before that steel was shipped. The United States obtained title from Murdock to that steel after shipment, subject to Ramco's prior right to withhold possession.

### (b).

■ Although the Bankruptcy Court's findings are incomplete with respect to when shipments of steel occurred, the evidence shows that Ramco shipped some of the steel before Murdock became insolvent. By contract with Murdock, the United States obtained title to the steel "forthwith" after shipment and before Ramco had any right to refuse or to stop delivery. Under the general federal decisional rule, implicit both in *United States v. Alabama, supra,* and *United States v. Armstrong, supra,* Ramco's "liens" could not attach once the United States took title to the steel. We are convinced, however, that federal law in cases such as this must incorporate the commercial laws of the several states, and we so hold.

In *United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979), the Supreme Court decided two cases of competing liens or security interests. In one case, the issue was whether a contractual security interest, held by the Small Business Administration (SBA), was superior to that of a private wholesaler which was not yet choate when the SBA's interest was created. In the other case, the issue was whether a security interest of the Farmers Home Administration (FHA) was superior to a subsequent repairman's lien. The government argued for the federal "first in time, first in right" and "choateness" tests which federal courts traditionally applied in tax lien cases. The SBA and FHA interests would have defeated the competing private interests had the Court applied those tests.

The Court rejected a uniform federal common law based on the "first in time, first in right" and "choateness" principles. Instead, it held that the relative priority of private liens and liens arising from the SBA and FHA lending programs is to be determined by reference to "nondiscriminatory state laws". 440 U.S. at p. 740, 99 S.Ct. at p. 1464. The Court noted that in forty-nine of the fifty states, those laws are variants of the Uniform Commercial Code. 440 U.S. at p. 732, n. 28, 99 S.Ct. at p. 1460, n. 28.

Many of the reasons which support the holding in *Kimbell Foods* persuade us that we must adopt state law as the rule of decision in this case. State commercial codes control the mainstream of business life in this country. These codified rights and duties allow business to work within the framework of a settled, predictable environment. Thus, businessmen reasonably rely on the availability of those rights and duties unless otherwise agreed. *See: United States v. Kimbell Foods, Inc., supra* at 739–740, 99 S.Ct. at 1464.

By contract with Murdock, the government interposed its title to the steel as early as possible without contractual obligation to Ramco. Ramco had no knowledge that Murdock was simply a conduit for passing title to the United States. In the government's view, this is of no significance. The government believes its hidden title overrode rights of Ramco to which others are subject. The government thus argues that Ramco cannot look to it for payment, and that Ramco has no rights of stoppage as against the government.

In our view, if the government is allowed greater rights in the marketplace than others, then in every sale, including those between private parties, it becomes for the seller relevant, and perhaps critical, to probe whether the government is somehow secretly involved. Once government involvement is discovered, the peculiar legal effect of such involvement as it bears on the seller's risks must be ascertained. In some instances, sellers, in spite of investigation, will fail to discover the government involvement until it is too late to take protective measures. Mindful of the burdens of time and expense such investigations would impose on our nation's commerce, and the injustice which would result by dealing government "wild cards" to businessmen at random, we are not inclined to create a special commercial law for the government's benefit.

The state commercial codes do not frustrate the objectives of government procurement programs. *Cf. United States v. Kimbell Foods, Inc., supra* at 733–738, 99 S.Ct. at 1460–1463. We recognize that the United States must have the means to acquire materials necessary for defense and other governmental purposes. Nevertheless, we believe the government is capable of protecting itself within the framework of state commercial law.

Overlooking the fact that cold drawn bar steel is readily available from many sources, and that the steel involved in this case has been disposed of, and assuming that the government needed to ensure its possession of specific shipments of Ramco steel in order to complete its missile program, still there were several options available to the government. The government might have required Murdock to include a waiver of seller's stoppage rights in its agreement with Ramco. Or perhaps, the government might have contracted with Ramco directly, or designated Murdock its purchasing agent.[1]

The Supreme Court noted in *United States v. Kimbell Foods, Inc., supra,* that operating practices of the SBA and FHA took state law into account. 440 U.S. at pp. 730–732, 99 S.Ct. at pp. 1459–1460. The government has not argued in this case that its procurement programs demand a uniform federal commercial law. Companies doing business on a nationwide scale must consider differences among the states' commercial codes. The government can like-

---

1. The contention that Murdock was, in fact, merely the government's agent was not raised in the Bankruptcy Court or in the briefs. At oral argument Ramco agreed, and the government disagreed, with this Court's suggestion that perhaps Murdock was such an agent.

wise do so. By virtue of strong bargaining power and widely available financial resources, the United States can achieve, through the use of specific contract terms, the uniformity it deems necessary. Still, extensive changes in government procurement operations are hardly necessary. The states' commercial codes are remarkably alike. As the Court observed in *Kimbell Foods*, quoting from *United States v. Wegematic Corp.*, 360 F.2d 674, 676 (2d Cir. 1966), "When the states have gone so far in achieving the desirable goal of a uniform law governing commercial transactions, it would be a distinct disservice to insist on a different one for the segment of commerce, important but still small in relation to the total, consisting of transactions with the United States." 440 U.S. at p. 732, n. 28, 99 S.Ct. at p. 1460.

## II.

The United States contends that the District Court erred in finding that Ramco, as seller, had a superior right to that of the government pursuant to § 2–705 of the Uniform Commercial Code. Section 2–705, of course, was the predicate for the Court's ruling that Ramco's right to stop delivery of the steel in transit upon learning of Murdock's insolvency was not rendered ineffective or terminated by virtue of the government's claim that prior to the stoppage it had become a good faith purchaser for value from Murdock. The government argues that even under the Uniform Commercial Code the United States must be awarded the proceeds from the sale of the steel.[2] The government contends that it is a good faith purchaser for value of the steel, and although the Bankruptcy Court made no findings on the matter, we assume, *arguendo*, that the contention is correct.

Section 2–705 of the Uniform Commercial Code states that, "The seller may stop delivery of goods in the possession of a carrier or other bailee when he discovers the buyer to be insolvent . . . ." This provision descends from the equitable right of stoppage *in transitu* which, by the preponderance of authority, "was the assertion of a right in the nature of a lien against property whereof another held title". *Northern Grain Co. v. Wiffler*, 223 N.Y. 169, 119 N.E. 393, 394, 7 A.L.R. 1370 (1918). "The right of stoppage in transitu [was] merely an extension of the lien for the price which the vendor [had] after contract of sale and before delivery of goods sold on credit." *Johnson v. Eveleth*, 93 Me. 306, 45 A. 35, 37 (1899); *accord, Letts-Spencer Grocer Co. v. Missouri Pac. Ry. Co.*, 138 Mo.App. 352, 122 S.W. 10, 11 (1909). *See:* U.C.C. § 9–113 (Official Comment).

Under the Uniform Commercial Code, the seller's refusal to deliver goods in his possession to an insolvent buyer, and the seller's order to stop delivery of goods in the possession of a carrier or warehouseman, remain dual aspects of the seller's right to withhold possession of goods from an insolvent buyer. (U.C.C. § 2–702(1)). That right attaches when the buyer becomes insolvent, but generally speaking, it is enforceable at any time until the goods have come into the buyer's actual or constructive possession. (U.C.C. § 2–705(2)). Who has "title" to the goods is a matter of no relevance whatsoever. (U.C.C. § 2–401). Our view is that a seller's right of stoppage is not cut off by the intervention of a third party good faith purchaser.

Although it is true that "[a] person with voidable title has power to transfer a good title to a good faith purchaser for value" (U.C.C. § 2–403(1)), we see no relevance in this language. In § 2–702 ("Seller's Remedies on Discovery of Buyer's Insolvency") we find a significant difference of treatment between the seller's right to reclaim goods that an insolvent buyer has already received (§ 2–702(2)), and the seller's right of stoppage with respect to goods not yet received by the buyer (§ 2–702(1)). The seller's right to reclaim goods in the buyer's possession is expressly made subject to "the

---

**2.** Although the Bankruptcy Court did not determine which state commercial code governed the relative rights of the parties, the commercial law relevant to this case is the same under the New York, Indiana and Utah versions of the Code.

rights of a buyer in ordinary course or other good faith purchaser under this Article (Section 2–403)." (§ 2–702(3)). The reference to § 2–403 is a reference to the title which the good faith purchaser for value obtains from a transferor with a voidable title. Thus, the Code provision on the seller's right to reclaim goods in the insolvent buyer's possession appears to present an exception to the general rule that a seller's remedies are not affected by matters of title.[3]

In contrast, the provision on the seller's right to stop delivery of goods in transit (§ 2–702(1)) makes no reference to title or the rights of good faith purchasers. The case for protecting a good faith purchaser from the seller's right of stoppage is, if anything, weaker and more in need of specific support in the language of the Code than is the case for protecting such a purchaser from the seller's right of reclamation. Since § 2–702 explicitly does protect the good faith purchaser from the seller's right of reclamation, that section, in equally explicit terms, would protect a good faith purchaser from the seller's right of stoppage were such protection intended. Cf. Amoco Pipeline Co. v. Admiral Crude Oil Corp., 490 F.2d 114, 117 (10th Cir. 1974), holding that a seller's stoppage of goods in transit under New Mexico's commercial code was effective regardless of whether title passed to the buyer.

The only decision we have found which has addressed the question of whether a seller may stop delivery of goods under § 2–705 as against a good faith purchaser for value is Ceres, Inc. v. ACLI Metal & Ore Co., 451 F.Supp. 921, 925 (N.D.Ill., E.D. 1978). There the Court held that the rights of a good faith purchaser for value are subject to the seller's right of stoppage until delivery of the goods to the buyer or good faith purchaser. The Court further held that an attornment of a bailee of the goods to the buyer or good faith purchaser,

as well as a physical transfer of the goods to the buyer or good faith purchaser, constitutes "delivery". According to Ceres, the events that cut off the seller's right of stoppage as against the buyer (§ 2–705(2)(a), (b), (c)), also cut off such right as against the good faith purchaser for value.

No contention has been made that the steel was delivered to the government. In the Bankruptcy Court, the trustee cross-examined an officer from the Indiana warehouse in an attempt to establish that the steel came into Murdock's physical or constructive possession in Indiana, and that the warehouse had attorned to Murdock in writing or by telephone. That effort failed. The testimony of the witness does not support a finding that the steel was in any sense "delivered" to Murdock. Although the government argued on appeal to the District Court that Murdock obtained physical possession of the steel in Indiana, it no longer contends that the steel was delivered to Murdock.

The provisions of the Code concerning documents of title support our conclusion that a good faith purchaser for value does not cut off the seller's right to stop delivery of goods in transit. Goods in transit, and "in the possession of a carrier or other bailee" (U.C.C. § 2–705(1)), invariably are consigned under a document of title, such as a bill of lading. There was evidence in this case that the steel was consigned under non-negotiable straight bills of lading.

The federal statute dealing with bills of lading for the movement of interstate commerce (39 Stat. 538, 49 U.S.C. §§ 81–124), states that, "Where an order bill has been issued for goods no seller's lien or right of stoppage in transitu shall defeat the rights of any purchaser for value in good faith to whom such bill has been negotiated" (49 U.S.C. § 119) (Emphasis supplied). But "[a] straight [i. e., non-negotiable] bill can not be negotiated free from existing equities, and the indorsement of such a bill gives the

---

**3.** Section 2–401 of the Uniform Commercial Code provides:

[E]ach provision of this Article with regard to the rights, obligations and remedies of the

seller, the buyer, purchasers or other third parties applies irrespective of title to the goods except where the provision refers to such title.

transferee no additional right." (49 U.S.C. § 109). Thus, even if the government were a transferee of the straight bills of lading covering the steel (and there is no evidence that the government was such a transferee), the government would be subject to Ramco's right of stoppage. *See: Weyerhaeuser Timber Co. v. First Nat. Bank*, 150 Or. 172, 38 P.2d 48 (1934); and *Kasden v. New York, N.H. & H.R. Co.*, 104 Conn. 479, 133 A. 573 (1926). *See also: Clock v. Missouri-Kansas-Texas R. Co.*, 407 F.Supp. 448 (E.D.Mo., E.D.1976), *affirmed without opinion*, 553 F.2d 102 (8th Cir. 1977), where the Court held that a seller was entitled to goods stopped in transit as against the third party transferee of a straight bill of lading. Answering the transferee's contention that it was a bona fide purchaser for value, the Court stated, "Under the authority of 49 U.S.C. § 81 *et seq.*, there cannot be such status where one is a transferee under a straight bill of lading." 407 F.Supp. at p. 450. These decisions and statutes are consistent with the Uniform Commercial Code, which provides that the seller's right of stoppage is cut off as against the buyer upon "negotiation to the buyer of any negotiable document of title covering the goods". (§ 2–705(2)(d)). There was no evidence that negotiable documents of title for the steel were issued, let alone that such documents were negotiated to Murdock or the government.

The old equitable right of stoppage *in transitu* has been repeatedly held to defeat rights of good faith purchasers for value. *See, e. g., Branan v. Atlanta & W.P.R. Co.*, 108 Ga. 70, 33 S.E. 836 (1899); *Ocean S.S. Co. v. Ehrlich*, 88 Ga. 502, 14 S.E. 707 (1892); *Pattison v. Culton*, 33 Ind. 240 (Ind. 1870); and *Chandler v. Fulton*, 10 Tex. 2 (1853). Section 62 of the Uniform Sales Act provided that the unpaid seller's right of stoppage in transit "is not affected by any sale or other disposition of goods which the buyer may have made, unless the seller has assented thereto." Regrettably, the Uniform Commercial Code is not explicit on this point. However, if the drafters of the Code had intended to give third party purchasers greater rights than under previous law, we believe that the official comments to the Code provisions on stoppage in transit would reflect that intention. Instead, the official comments do not indicate a change from prior law. *See* U.C.C. § 1–103.

Paragraph 2 of the official comments to § 2–705 explains that receipt of goods by a "subpurchaser" bars the seller from stopping the goods in transit. The rationale given is that in such circumstances the seller has "acquiesced" in the third party's purchase from the insolvent buyer. The rationale implies that without "acquiescence" in the sale to the third party, the seller retains his right of stoppage just as he did under § 62 of the Uniform Sales Act. Ramco did not acquiesce in the transfer of steel from Murdock to the government. Ramco was unaware of the transfer.

WE AFFIRM.