803 F.2d 720
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
MAREMONT CORPORATION, Plaintiff-Appellee
v.
HOESCH AMERICA, INC., Defendant-Appellant.
 No. 85-1360.
 United States Court of Appeals, Sixth Circuit.
 Sept. 12, 1986.
 
 Before: KENNEDY and WELLFORD, Circuit Judges; and BROWN, Senior Circuit Judge.
 BAILEY BROWN, Senior Circuit Judge.
 
 
 1
 Defendant-Appellee Hoesch America, Inc. (Hoesch) appeals a judgment of the district court awarding Plaintiff-Appellee Maremont Corporation (Maremont) damages in the amount of $51,460.80 in its suit for conversion. Maremont brought a diversity action under Michigan law claiming that Hoesch had converted approximately 600,000 pounds of steel that Maremont had purchased from United Steel Products (USP). USP had, as a middleman, purchased the steel from Hoesch. The misappropriation allegedly occurred when Hoesch exercised its claimed rights as a secured creditor of USP or exercised its claimed rights of stoppage as to steel not yet delivered to USP. The district court ruled that Maremont had rights to the steel under Mich. Comp. Laws Ann. Sec. 440.9307 (1976) as a buyer in the ordinary course of business. Such rights, the court reasoned, were superior to Hoesch's rights. On appeal, Hoesch asks us to reject the district court's conclusion that Maremont qualified as a buyer in the ordinary course of business. Alternatively, Hoesch urges us to find that it was a bailor with respect to the steel not yet delivered to USP, thereby giving Hoesch stoppage rights to the steel under Mich. Comp. Laws Ann. Sec. 440.2705, which had priority over Maremont's rights as a buyer in the ordinary course.
 
 I.
 
 2
 Maremont is a Delaware corporation primarily engaged in the business of manufacturing and distributing shock absorbers and mufflers. Marwil Products (Marwil) is a division of Maremont which specializes in the manufacture of "U-bolts" for use in the automotive industry. Hoesch, a Georgia corporation, is a wholesale supplier of steel. Hoesch purchases steel directly from the steel mills and sells to retail steel suppliers. USP, a defunct Michigan corporation, was a retail supplier. USP would purchase raw steel from a wholesale supplier, such as Hoesch, have the steel pickled and limed by a local steel processor and then cut the steel to order to its customer's specifications.
 
 
 3
 Before beginning our discussion of the facts which gave rise to the instant lawsuit, we believe it helpful to summarize in some detail the customary business relationship between the aforementioned parties.
 
 
 4
 Marwil generally used two different methods for ordering steel from its supplier, USP. The first method was to purchase steel on an individual order basis. Under this arrangement, Marwil would contact USP regarding its need for steel and purchase the steel from USP if USP had the necessary quantity and type of steel in stock. If, however, the steel was not in stock or if Marwil anticipated a large future order from one of its customers, Marwil would place a "blanket order" with USP, requestng USP to obtain steel according to its specifications.[1] William Marwil, the president of Marwil, testified that this latter method was utilized in order to "lock in" a favorable price and to insure that the requisite steel would be available in the future.
 
 
 5
 Once USP received an order from Marwil, it would contact its supplier, Hoesch, as to the price and availability of the steel and then relay the information to Marwil.[2] If satisfactory, Marwil would confirm the order with a written purchase agreement, and USP would place the order with Hoesch (in Atlanta, Georgia) which in turn ordered the steel from a mill. The raw steel would then be shipped directly from the mill to a steel processor in the Detroit area designated by USP, in this case either Georgia Screw Products or Patterson Heat Yreat. The raw steel would be accompanied by a bill of lading and a delivery slip, a copy of each of which was mailed to USP. When USP received these documents, it would send Marwil an invoice as well as a copy of the bill of lading and delivery slip. Marwil would promptly pay for the steel when it received the invoice from USP. William Marwil testified that when he received an invoice with copy of the bill of lading and delivery slip and paid the invoice, he assumed that he could have the steel processed and delivered at any time. Marwil further indicated that at this point the steel became a part of his company's inventory, even though it was not in its physical possession. When Marwil needed the steel, it would simply send USP a release and the steel would be processed and delivered to Marwil.
 
 II.
 
 6
 In anticipation of becoming the exclusive supplier of U-bolts for the 1980 model Chevrolet trucks, Marwil placed a series of eight orders with USP from February to June of 1979 for approximately 600,000 pounds of 21/32 steel and 125,450 pounds of 9/16 steel. Upon receiving the order, USP contacted Hoesch which in turn bought the steel from the steel mill. The steel was subsequently shipped to the processors to await treatment. USP invoiced Maremont for the steel and was promptly paid.
 
 
 7
 Shortly thereafter, the demand for U-Bolts dramatically decreased,[3] and Marwil was left with a large inventory of steel which remained at the processors awaiting release. Marwil managed to sell some of its steel to Rod Conversion in February of 1980 and also received credit to its account with USP when some of this steel USP earlier had delivered was returned as defective. In October of 1980, Marwil learned for the first time that USP had gone out of business. Prior to this time, Marwil had no knowledge of USP's financial condition or of any security interest held by a third party in USP's assets.
 
 
 8
 Unbeknownst to Marwil, Hoesch had begun instituting a special procedure with USP for monitoring the release of steel from the processors/warehouses as early as 1978 and had required USP to secure from Hoesch its approval before obtaining a release of steel. The record is not clear, however, as to what extent this procedure was in place and actually followed with respect to these shipments of steel delivered to the two processors/warehouses and paid for by Maremont. In June of 1980, Hoesch retained an accountant, William Wetmore, to monitor more closely USP's financial affairs. Upon inspection, Wetmore reported to Hoesch that USP was insolvent. Thereafter, in August of 1980, Hoesch and USP entered into written agreements which permitted USP to continue to operate and which allowed Hoesch to regulate directly USP's business affairs. Under this arrangement, Wetmore was required to cosign all of USP's checks, prepare an operating budget for USP and approve the release of any shipment of steel in excess of a specified weight. The parties also executed a security agreement acknowledging that USP was indebted to Hoesch in the amount of $1,847,554.06 and granting Hoesch a security interest in all of its inventory.
 
 
 9
 In September of 1980, Wetmore was apprised for the first time of Marwil's business relationship with USP. Wetmore directed USP not to honor any further release orders from Marwil. There is evidence that, despite Wetmore's directive, steel was in fact released upon request to Marwil. As of late fall, however, USP still had not delivered to Marwil approximately 617,000 pounds of steel for which USP had been paid. Of this steel, approximately 10,000 pounds had been delivered to USP and the remainder was in the warehouses of the processors. In accordance with its claimed rights under the security agreement with respect to USP's inventory and its claimed rights of stoppage with respect to steel in the hands of the processors/warehouses, Hoesch, in February of 1981, sold the Marwil steel and used the proceeds to reduce USP's debt.
 
 
 10
 On August 18, 1985, Maremont commenced suit for conversion against Hoesch in the United States District Court for the Eastern District of Michigan. Maremont alleged that it had purchased steel from USP, through its subsidiary Marwil, and paid for it in good faith and without knowledge of any adverse interest held by Hoesch, thus Qualifying as a "buyer in the ordinary course of business" under Mich. Comp. Laws Ann. Secs. 440.1101 et seq.[4] As such, Maremont contended that under Sec. 9-307 it took free and clear of any security or other interest Hoesch had in the steel.
 
 
 11
 The case was tried without a jury on a partially-stipulated record. On April 3, 1985, the district court rendered judgment in favor of Maremont and awarded damages in the amount of $51,460.00 plus interest and costs. The district court ruled that Maremont was a buyer in the ordinary course of business with respect to all of the steel within the meaning of Sec. 1-201(9) when it paid USP for the steel. It ruled that, as such, its rights under Sec. 9-307 were superior to those of Hoesch as a secured creditor as to steel in USP's inventory. The district court further rejected Hoesch's argument that it had a superior right as an alleged bailor under Secs. 2-702 & 2-705 to stop delivery to Maremont with respect to steel in the hands of the processors/warehouses. Without really deciding whether Hoesch was a bailor, it determined that, even if it were, Maremont's rights to the steel were superior. The district court noted the difficulty in placing the loss as between two relatively innocent parties, but concluded that the loss should fall on "the party who dealt most closely with the 'bad guy."' Joint Appendix (JA) at 43 (citing J. White & R. Summers, Uniform Commercial Code Sec. 25-13, at 1070 (2d ed. 1980)). The district court concluded that Hoesch should bear the loss because it did deal more closely with USP. In reaching this determination, the district court stated that Hoesch permitted USP to extend its credit limit and remain in operation while Maremont was unaware of Hoesch's interest in the steel. Further, the court noted, the employment of Wetmore by Hoesch to monitor the financial affairs of USP reinforced its conclusion that Hoesch was more closely involved with the guilty party.
 
 
 12
 On appeal, Hoesch first claims that Maremont was not a buyer in the ordinary course as Maremont failed to prove that it acted in "good faith" within the meaning of the statute and because Maremont's seller, USP, never had possession, actual or constructive, of most of the steel paid for by Maremont.[5] Second, Hoesch argues that even if Maremont qualified as a buyer in the ordinary course, Hoesch had a superior right to seize the goods under Sec. 2-705 which provides that a seller may stop goods in the possession of a carrier or bailee when the seller discovers that the buyer is insolvent.
 
 III
 
 13
 In contending that Maremont was not a buyer in the ordinary course, as such is defined by Sec. 1-201(9), Hoesch claims that Maremont was not acting "in good faith" in this transaction. Hoesch argues that Maremont's failure to make a record check for security interests, its payment for the steel before it obtained actual possession and its allowing the steel to remain in the processors' warehouses show a lack of good faith. We agree, however, with the district court that, in view of Maremont's past good business relations with USP and in view of the fact that Maremont had received bills of lading and delivery slips proving that the steel had arrived at the warehouses of the processors, Maremont acted in a commercially reasonable manner in paying for the steel without then taking delivery. Moreover, we believe that the fact that Maremont left the steel at the processors/warehouses for an unusually long time is irrelevant to the issue as to whether it was in good faith when it paid for the steel.
 
 
 14
 Since we agree with the district court that Maremont satisfied the "good faith" requirement for "buying in the ordinary course of business" and since USP unquestionably acquired possession of approximately 10,000 pounds of this steel, we affirm the district judge's determination that Maremont was a buyer in the ordinary course with respect to such steel and as such its rights were superior to Hoesch's rights as a secured creditor.
 
 
 15
 We cannot, however, at this point resolve the question as to whether the district court should be affirmed in its determination that Maremont was a buyer in the ordinary course as to the remainder of the steel and its determination that, as such, Maremont's rights were superior to Hoesch's claimed rights as a bailor. Our problem is partly a result of a dearth of applicable decisions in these areas under the Uniform Commercial Code, particularly in Michigan, but our problem is mainly a result of the district court's not making findings on issues that may be determinative.
 
 
 16
 Hoesch contends that, even if Maremont met the stated statutory requirements of a buyer in the ordinary course, Maremont nonetheless was not such a buyer because USP never had constructive possession of the steel that was never delivered to USP. In other words, Hoesch contends that there is an implicit requirement in Sec. 1-201(9), defining a buyer in the ordinary course, that the seller have or acquire actual or constructive possession. The argument is that, implicitly under the statute, Maremont could not have been a buyer in the ordinary course, for example, before the steel existed, or after it was manufactured and before it was shipped, and that the statute assumes a requirement that the steel came into the actual or constructive possession of Maremont's seller, USP. Hoesch argues that if this were not so, the rights of a buyer in ordinary course from a seller who never had even constructive possession of goods would come into conflict with the rights of stoppage of a bailor under Sec. 2-702 and Sec. 2-705 upon discovering that the purchaser is insolvent.[6] The district court did not make a finding as to whether USP had constructive possession. We therefore remand for a finding on the question whether USP had constructive possession and for a conclusion as to whether Maremont was a buyer in the ordinary course.
 
 
 17
 Hoesch further contends that, even if Maremont were a buyer in the ordinary course, its rights were subject to Hoesch's rights under Sec. 2-702 and Sec. 2-705, as a bailor, to stop delivery and reclaim the steel when it ascertained that USP was insolvent. The district court did not actually make a finding as to whether Hoesch was a bailor with respect to this steel, but it did proceed to hold that, even if Hoesch was a bailor, its rights would be inferior to those of Maremont because Hoesch was closest to the "bad guy," USP. Hoesch argues that, on the contrary, the rights of the bailor should prevail, relying on In re Murdock Machine & Engineering Co., 620 F.2d 767 (10th Cir. 1980). We therefore remand for a finding as to whether Hoesch was a bailor with respect to the steel in the warehouses of the processors at the time it reclaimed this steel and for a conclusion as to whether Hoesch's rights as a bailor would be superior to Maremont's rights as a buyer in the ordinary course.
 
 
 18
 We therefore affirm in part, vacate in part, and remand for further proceedings consistent with this opinion.
 
 
 
 [1]
 Michael Heitchue, the general manager of USP, testified that this method of ordering large quantities of steel and requesting future delivery was not unusual within the industry
 
 
 [2]
 The record indicates that Marwil was not aware that USP was acting as a middleman for Hoesch. Rather, William Marwil stated that he believed USP was acquiring the steel directly from the mills
 
 
 [3]
 The decrease in demand was brought about by the combination of a decline in the truck market and a decision by General Motors not to use Marwil as its sole supplier of U-bolts
 
 
 [4]
 For the sake of convenience, all references to the Secs. 440.1101 et seq., are listed in their Uniform Commercial Code (UCC) form, viz., Sec. 1-101 instead of Sec. 440.1101
 
 
 [5]
 Hoesch appears to concede that if Maremont was acting in "good faith," then it would have been a buyer in the ordinary course with respect to steel (approximately 10,000 pounds) that had actually been delivered to USP prior to Hoesch's repossession and sale
 
 
 [6]
 Neither party cites any adjudicated case on the question of whether it is necessary that USP have had or acquired constructive possession of the steel