852 F.2d 568
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
MAREMONT CORPORATION, Plaintiff-Appellant,
v.
HOESCH AMERICA, INC., Defendant-Appellee.
 No. 87-1804.
 United States Court of Appeals, Sixth Circuit.
 July 22, 1988.
 
 Before WELLFORD and ALAN E. NORRIS, Circuit Judges, and R. ALLAN EDGAR*, District Judge.
 WELLFORD, Circuit Judge.
 
 
 1
 Previously before us and remanded to the district court for further findings, this commercial dispute was brought in the district court on the basis of diversity jurisdiction. We found no error in the district court's prior conclusion that Maremont was a buyer in the ordinary course with respect to a part of the quantity of steel involved (approximately 9,400 pounds).[1] As a buyer in the ordinary course, we held that plaintiff Maremont possessed rights superior to Hoesch's with respect to that quantity. As to the great bulk of the steel, the remainder, consisting of about 600,000 pounds that Maremont had purchased from United Steel Products (USP), now defunct, we remanded (1) for findings as to whether or not USP had constructive possession of the steel in question, (2) for a conclusion as to whether or not Maremont was a buyer in the ordinary course, (3) for a finding whether Hoesch was a bailor with respect to steel in the warehouses of the processors at the time it reclaimed the steel, and (4) for a conclusion as to whether Hoesch's rights, if any, as a bailor would be superior to plaintiff's rights as a buyer.
 
 
 2
 Marwil Products (Marwil), a division of Maremont, specializes in the manufacture of "U-bolts" for use in the automotive industry. Marwil would order steel from USP, a retail supplier, who would in turn contact Hoesch, a wholesale supplier. Hoesch, essentially USP's broker or inventory financier, would order raw steel directly from the mills for USP and have it delivered to a steel processor to be pickled and limed. The steel would then be shipped on to USP to be drawn and cut to Marwil's specifications before being sent to Marwil for its use in manufacturing U-bolts. At times Marwil placed "blanket orders" with USP, which would arrange with Hoesch to have the steel delivered to the processors and left there until Marwil, through USP, requested its processing and further shipment.
 
 
 3
 Two of the processors to which Hoesch shipped steel were Michigan Screw Products (MSP) and Paterson Heat Treat, Inc. (PHT). On or before October 28, 1978, MSP agreed with Heosch that it would not release any amount of the steel purchased by Hoesch from steel mills for the account of USP without a release from Hoesch, and this agreement was later extended. Hoesch paid MSP storage charges, but did not pay PHT such charges. Steel was not to be released except upon Hoesch's approval.
 
 
 4
 In a letter dated August 9, 1979, Hoesch's representative Judy Cocking confirmed a similar understanding with PHT. In that letter, Cocking advised that the steel would be for USP, and all charges would be for the account of USP, but that the tags on the material would be marked Hoesch "and should remain in the name of Hoesch America until a release is made from this office." All parties concerned, including USP, understood these release agreements to mean that the steel was owned by Hoesch and was to be simply stored with MSP or PHT when shipped with no treatment performed until Hoesch gave its consent upon USP's request for release of the steel to be processed. Marwil, however, had no knowledge of this arrangement. PHT issued to Hoesch receiving reports and periodic inventory lists showing the amount of Hoesch's inventory held in storage. In addition, Hoesch itself took physical inventories of the steel it had in storage at MSP and PHT.
 
 
 5
 The essential facts of the controversy were set out in our prior unpublished per curiam decision which was filed September 12, 1986, and we do not reiterate all of them. District Court Judge Woods, upon remand, set out his findings and conclusions in a twelve page memorandum decision dated June 30, 1987. Some 444,300 pounds of the steel in dispute were located at MSP's warehouse, and approximately 168,000 pounds were located at PHT's warehouse.
 
 
 6
 A. FINDINGS AND CONCLUSIONS OF THE DISTRICT COURT
 
 1. Constructive Possession by USP
 
 7
 The district court found that Hoesch and PHT agreed prior to shipment that the latter would not process the steel to be held in storage by PHT in Hoesch's name for the account of the middleman, USP, until Hoesch authorized its release. Maremont contends that this finding was error because Hoesch and PHT did not reach an agreement about the steel until "one month after the last delivery." Maremont bases this contention on prior findings by the district court that USP included with its invoices to Maremont a bill of lading showing delivery and that Maremont had been invoiced for all the steel involved in this dispute by July 18, 1979, several weeks before the Hoesch-PHT agreement. Maremont also argues that the steel in question was all entered on USP's inventory cards by July 1, 1979, after a receiving report was received from the processor.
 
 
 8
 The district court found that all steel stored at PHT was inventoried and recorded on USP's records before PHT sent receiving reports to Hoesch. USP had previously invoiced it to Maremont (or its division Marwil).
 
 
 9
 The question of whether USP forwarded copies of the bills of lading to Maremont with its invoice for the steel shipped to PHT was not clear. The district court concluded that its prior finding that the steel had all been invoiced to Maremont by USP by June 28, 1979 and paid for by July 18, 1979 was supported by the facts, and Maremont does not challenge that finding. The district court also determined, however, that all shipments to PHT were made after the effectuation of the release agreement on August 9, 1979, thus precluding any reliance by Maremont upon the bills of lading accompanying those shipments when making payment. These two findings effectively reverse the prior findings that the steel was shipped to the processors before Maremont was invoiced. The determination by the district court that it was "more likely than not" that the shipments to PHT occurred after the release arrangement was effectuated is within the scope of the remand by this court. This result, although unusual, is therefore not precluded by the "law of the case" doctrine.
 
 
 10
 MSP agreed with Hoesch that it would not release from storage at its warehouse any of the steel purchased by Hoesch on the account of USP from the manufacturer without a release from Hoesch. This agreement was in effect, according to the district court's findings, during the time of Maremont's purchases. The MSP-Hoesch agreement was carried out, and MSP, like PHT, never "acknowledged to the buyer ... [that the goods were held] for the buyer" under Sec. 2-705(2)(b) of the Uniform Commercial Code as adopted in Michigan (Mich.Comp.Laws Ann. Secs. 440.1101 et seq.). Under that section of the U.C.C. the district court concluded that Hoesch's rights to stop delivery of the disputed steel were not abated.
 
 2. Buyer in the Ordinary Course
 
 11
 The question posed by this court to the district court to be determined on remand was whether it was essential under the U.C.C., applicable in Michigan, for USP to have actual or constructive possession of the disputed goods before Maremont, buyer of these goods, might be a buyer "in the ordinary course" from USP. Although the district court cited no case authority on this particular point, it did hold that "identification of the goods to the contract is the critical moment that determines whether a buyer is one in the ordinary course." See Big Knob Volunteer Fire Co. v. Lowe & Moyer Garage, Inc., 338 Pa.Super. 257, 487 A.2d 953, 957-59 (1985). At the crucial time, the goods in dispute were identified, the district court held, as those of Hoesch. The district court held that PHT and MSP were independent entities not related to or maintained by USP. The district court held further that without the Sec. 2-705(2)(b) acknowledgement, legal equivalent to an attornment,[2] a buyer does not confer good title upon even a subsequent bona fide purchaser, citing Ceres v. ACLI Metal & Ore Co., 451 F.Supp. 921, 925 (N.D.Ill.1978). See U.C.C. Sec. 2-403(1). It thus held that, without constructive possession, USP could not, under the circumstances, confer good title upon Maremont of the goods stored at PHT and MSP which were the subject of restrictive agreements with Hoesch. It concluded, therefore, that "Maremont did not obtain the status of a buyer in ordinary course."
 
 3. Bailment
 
 12
 After reaching its decision on the prior questions, the district court felt it unnecessary to discuss the bailment issue. After defining the term under Michigan law, however, (citing National Ben Franklin Ins. Co. v. Bakhaus Contractors, Inc., 124 Mich.App. 510, 512 fn. 2, 335 N.W.2d 70 (1983)) Judge Woods found that Hoesch attained bailor status under the circumstances.
 
 4. Superior Right to the Steel
 
 13
 Since Maremont was deemed not to be a buyer in the ordinary course, its rights were held to be inferior to those of Hoesch by the district court. Since Hoesch was deemed to be in a status equivalent to that of a bailor, its rights were superior and its seizure or stoppage of the steel was upheld despite the lapse of time involved. The buyer, USP, never attained possession, actual or constructive, and so Hoesch's rights to stop delivery of, or to reclaim the goods in question was not defeated.
 
 B. ANALYSIS
 
 14
 We discuss each of these responses of the district court mandated in our prior decision, recognizing that there were some findings of fact made upon reconsideration that differed from prior findings. The facts were in conflict and the issues close; we can therefore understand the difficulties involved in reaching a decision in this confusing and complex commercial controversy.
 
 
 15
 A key inquiry in this case is the meaning and effect of Hoesch's letter to PHT dated August 9, 1979. The letter made it clear that Hoesch would be shipping the steel in question "for" USP, but that it "should remain in the name of Hoesch ... until a release...." The steel was "for the account of" USP but was to be maintained separately pending ultimate release, and "all charges" for processing and the like "will be for the account" of USP. Also at issue was the meaning and effect of the "release agreement" between MSP and Hoesch dated October 30, 1978, not signed by Hoesch but determined by the district court to have been carried out by the parties. This writing in the form of a letter from MSP indicated that the steel in controversy was "owned" by Hoesch and was to be identified and segregated by MSP as "being the property of Hoesch" if so tagged by Hoesch and provided MSP was notified in advance. MSP therein agreed not to process the steel or to release it without first receiving a request from Hoesch, and to give Hoesch access to such steel and the right to remove it at any time upon payment of handling charges. Later documentation signed by both parties indicated and acknowledged such an agreement.
 
 
 16
 We find no error in the district court's interpretation of the meaning and effect of both of these agreements. Neither do we find any clear error in the district court's factual determination that PHT's August 9, 1979 agreement was made before the steel was received by it. It follows that we find no error in the district court's decision that USP did not have constructive possession of the steel sent to and held by PHT. Since MSP acknowledged to Hoesch that it was holding the steel in its storage facilities for it and never made a similar indication to USP or to Maremont, we also find no error in the district court's conclusion about constructive possession of the steel, sent to and held by MSP.
 
 
 17
 The next key conclusion was that Maremont could not be deemed a buyer in the ordinary course so as to obtain a title or interest with priority over that of Hoesch in the absence of attornment, and that there was no acknowledgement by any party in possession or control of the steel that it was being held for Maremont (Marwil) under U.C.C. Sec. 2-705(2)(b). Thus, with "no attornment, no delivery, and no conferring of title on Maremont," we are of the view that the district court was not in error in concluding that Maremont "did not attain the status of a buyer in ordinary course." Factual findings concerning attornment and delivery we find not to be clearly erroneous. The conclusions about constructive possession and conferring of title are neither illogical nor unsupported based upon these findings.
 
 
 18
 We agree with the analysis of similar issues from In re Murdock Machine & Engineering Co., 620 F.2d 767 (10th Cir.1980). The Murdock court affirmed decisions of the bankruptcy court and of the district court that refusal to deliver goods to an insolvent buyer, despite intervention of a "third party good faith purchaser" (the United States), was appropriate under the U.C.C. (Sections 2-702(1) and 2-705(2)) until the goods in question "in the possession of a carrier or warehouseman" had come into the buyer's (or the third party purchaser's) "actual or constructive possession." Id. at 773. The seller in that case was in a position equivalent to that of Hoesch, having delivered goods to a warehouse and to a carrier for delivery to the purchaser, Murdock, which was discovered to be insolvent before it acquired actual or constructive possession of these goods. Despite the urgings in that case of the United States, which occupied the position of a good faith purchaser from Murdock, the bankruptcy court, the district court, and a unanimous Court of Appeals held in Murdock that there remained a right to stop delivery before possession attached to the original buyer, whose position was equivalent to that of USP. As in Murdock, the district court in this case held that since the steel was not yet actually or constructively received by USP, the insolvent buyer, under U.C.C. 2-702(1), the seller's (Hoesch's) right to stop in transit prevailed. See Murdock, 620 F.2d at 773; see also Ceres v. ACLI Metal & Ore Co., 451 F.Supp. 921, 925 (N.D.Ill.1978) (cited by the Murdock court at 620 F.2d 767, 774). Murdock observed further, and we agree, that "[t]he old equitable right of stoppage in transitu has been repeatedly held to defeat rights of good faith purchasers for value." 620 F.2d at 775. While we also agree that the "Uniform Commercial Code is not explicit on this point,"[3] we find no error in the district court's interpretation of the law in Michigan in relation to its findings of fact, which we have determined are not clearly erroneous.
 
 
 19
 We would observe further in this case that Hoesch did not acquiesce in the sale and delivery of the steel in question to Maremont without its first being paid by USP for the steel. Hoesch did occupy the position of bailor as to the goods held by MSP and by PHT subject to Hoesch's order, and the steel was financed by Hoesch, which was found specifically to have protected its interests as to MSP, PHT, and USP. We acknowledge the hardship imposed upon Maremont, which received no prior notice of Hoesch's interest in the steel, by this decision.
 
 
 20
 We, nevertheless, AFFIRM the decision of the district court holding that Hoesch had superior rights to the steel.
 
 
 
 [1]
 This was steel which had actually been delivered to United Steel Products (USP), the middleman between Hoesch and Maremont, prior to Hoesch's repossession and sale. Judgment for plaintiff was affirmed as to this quantity
 
 
 *
 The Honorable R. Allan Edgar, United States District Judge for the Eastern District of Tennessee, sitting by designation
 
 
 [2]
 As to this term, we copy the footnote discussion of the district court: Attornment originally meant "a turning over or transfer by a lord of the services of his tenant to the grantee of his seigniory." Black's Law Dictionary, Fifth Ed. It is now widely used as equivalent to Sec. 2-705(2)(b), i.e. an acknowledgement by a bailee to a buyer that he is holding goods for him. See, e.g., 2 R. Anderson, Uniform Commercial Code, 2-705:24 at 369 (2d ed. 1971)
 
 
 [3]
 620 F.2d at 775